2024 IL App (2d) 230125
No. 2-23-0125
Opinion filed March 13, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-1100 |
| JORGE HERNANDEZ-CHIRINOS, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial in the circuit court of Lake County, defendant, Jorge Hernandez-Chirinos, was convicted of two counts of predatory criminal sexual assault of a child and three counts of aggravated criminal sexual abuse. The victim was his stepdaughter. Defendant was sentenced to a total of 35 years' imprisonment. On appeal, defendant argues that (1) he was denied a fair trial because the court misapplied the completeness doctrine, which allowed the jury to be misled and prevented the jury from a full exposition of the child victim's hearsay statements under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)), and (2) his trial counsel was ineffective for failing to introduce a victim sensitive interview during defendant's case-in-chief. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      For clarity, before detailing the proceedings in the court below, we begin with a broad overview of the facts developed at trial. On July 1, 2022, defendant was arrested and charged with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)). The alleged victim was his stepdaughter, J.V., who was 12 years old at the time of defendant's arrest. The prior day, June 30, 2022, J.V. told her mother, Ruth, that defendant had sexually abused her since she was eight years old, including an instance in December 2021 when defendant placed his penis inside her vagina. Ruth brought J.V. to the hospital, where they learned that J.V. was pregnant. Later that evening, J.V. participated in a victim sensitive interview (VSI 1), during which she detailed numerous instances of sexual abuse at the hands of defendant. J.V. did not disclose, either to her mother or during VSI 1, that anyone other than defendant had sexually abused her. The State played VSI 1 for the jury during its case-in-chief.

¶ 4      The pregnancy was terminated, and, on July 26, 2022, DNA testing of the fetal material revealed that defendant was excluded as the biological father. In light of this information, J.V. was brought in that same day for a second victim sensitive interview (VSI 2). During that interview, J.V. was initially reluctant to identify the other person who had sexual intercourse with her, and she stated that her mother would "be upset about who it was." After nearly 10 minutes of persuading and questioning, J.V. divulged, for the first time, that she was also sexually abused by her half-brother, Olegario Zelaya-Lopez. J.V. detailed four instances of sexual abuse perpetrated by her half-brother, culminating in the most recent occurrence—in January 2022—in which he placed his penis inside her vagina. J.V. reaffirmed that, during VSI 1, she told the truth regarding

defendant's abuse, and she provided further details regarding many of those specific incidents. J.V.'s half-brother was arrested that same day.

¶ 5                                    A. Pretrial Proceedings

¶ 6      Before trial, the State filed a notice of intent to introduce out-of-court statements that J.V. allegedly made to various individuals pursuant to section 115-10 of the Code, which carves out an exception to the rule against hearsay in cases involving a physical or sexual act perpetrated against a child under the age of 13. Defendant filed a response and objection to the State's motion, arguing that VSI 1 and VSI 2 constituted hearsay that, although admissible under section 115-10, reflected an improper attempt to bolster the testimony of the State's witnesses. Defendant also argued that J.V.'s statements concerning her sexual history were inconsistent between the two interviews, and her statements were therefore unreliable. Defendant requested that the court deny the State's request to admit the videotaped interviews. Defendant ultimately agreed to the State's motion, and the court entered an order granting the motion. The court ordered that J.V. and the persons she made the statements to be available to testify at trial.

¶ 7      The State also filed a motion *in limine* under the rape shield statute (725 ILCS 5/115-7(a) (West 2020)) seeking to exclude evidence of J.V.'s sexual contact with her half-brother. In the motion, the State noted that J.V. was also, separately, sexually abused by her half-brother, resulting in a pregnancy for which her half-brother was confirmed to be responsible. In the State's view, the evidence of J.V.'s sexual abuse by her half-brother was irrelevant to defendant's case. Therefore, the State sought to bar defendant from offering evidence pertaining to, or inquiring into, this aspect of J.V.'s sexual history.

¶ 8      Defendant filed an objection to the State's motion *in limine*, arguing that evidence of the sexual activity between J.V. and her half-brother fell within an exception to the rape shield statute

because such evidence was constitutionally required to be admitted. See *id*. Specifically, defendant contended that he had a right under the sixth amendment to ask J.V. whether her pregnancy was the result of sexual intercourse with someone other than defendant as a means to establish that J.V. had a motive to lie. Relying on statements that J.V. made during VSI 2, defendant asserted that J.V. had a motive to falsely identify defendant as her abuser because she wished to spare her mother the emotional anguish of learning that her son had impregnated her daughter. Inquiry into J.V.'s prior sexual activity with her half-brother was necessary, according to defendant, to ensure a full and fair defense.

¶ 9    On January 30, 2023, the court held a hearing on the State's motion *in limine*. There, the State clarified that it did not wish to keep the jury in the dark concerning the half-brother's sexual abuse of J.V. and the resulting pregnancy and that it had no objection to defendant circumventing the rape shield statute to the extent defendant wished to argue that J.V. had a motive to falsely accuse defendant of sexual abuse. It agreed that defendant could "explore that [J.V.] learned she was pregnant, her mom learned she was pregnant, [that J.V.] gave a statement to an interviewer, and *** didn't disclose that it was her brother." The State opined that, due to J.V.'s failure to state during VSI 1 that her half-brother was sexually abusing her, "defense is probably going to want to have that video played as much as the State." The State also clarified that it had no objection to defendant calling attention to the fact that, after defendant was excluded as the source of J.V.'s pregnancy, she was reluctant to implicate her half-brother because she did not want to break her mother's heart. According to the State, the parties disagreed only regarding the scope of questioning and the "extent to which Rape Shield would be pierced." The State was concerned that defendant might, at trial, "move [away] from bias, interest or motive into more specific act impeachment on collateral issues."

¶ 10    Defendant, at the hearing, noted that the parties agreed that some of the factual circumstances of the case implicated the constitutional exception to the rape shield law. He explained that his intention was "to argue the opposite of the evils" that the rape shield law was intended to prevent. In other words, he wished to emphasize the uncontroverted evidence that J.V. experienced sexual abuse perpetrated by her half-brother but also argue that defendant had not likewise sexually abused her. Defendant explained that his "intention [was] anything but making this poor victim out to be promiscuous; rather, we are desirous of presenting a defense showing her biases." Relevant to his argument in opposition to the broad application of the rape shield law in this case, defendant identified two possible motives that J.V. had to falsely accuse defendant of sexual abuse, namely that she feared her half-brother and did not wish to burden her mother with the knowledge that her half-brother impregnated her.

¶ 11    The trial court denied the State's motion *in limine* and ruled that defendant, at trial, could "go into the fact that [J.V.] has accused brother of sexually assaulting her." In explaining the basis for its ruling, the court noted that J.V.'s initial statements to her mother, as well as her statements during VSI 1, were "at least partially false" because she identified only defendant as her abuser and failed to disclose that her half-brother had sexually abused her during the same period. The court continued that "part of what [J.V.] said can be *** fairly construed, at least part of it, as falsely accusing the defendant of at least one act of sexual assault because she certainly didn't infer anybody else got her pregnant." The court expressed concern that J.V.'s "lie by omission" had the potential to create confusion for the jury and prejudice defendant. It stated that the only way to mitigate that confusion would be to allow defendant to explore the fact that J.V. was sexually abused and impregnated by her half-brother "and then let the jury decide." The court continued that the jury was "obviously entitled to know that the brother impregnated" J.V., and the parties

agreed to so stipulate. The court cautioned defendant that it would not grant him "unfettered access" to ask J.V. about "every single time with the brother going into detail" because that line of inquiry would "start going into some of the things the Rape Shield act is focused on, and, more importantly, we'd be going beyond what *** is a germane issue." The court conferred with the parties at length regarding the contours of its ruling. It reiterated that defendant could explore (1) whether J.V.'s half-brother had sexually abused her, as well as whether J.V. disclosed the abuse to either her mother or the forensic interviewer; (2) whether she feared her half-brother; (3) whether she disclosed the abuse to either her mother or during VSI 1; and (4) whether she wished to attribute the pregnancy to defendant because she missed her biological father. The court admonished defendant that "if you want to go further than that, you need to approach the bench and then [the court] would rule on that. And so, when in doubt, approach."

¶ 12    On February 17, 2023, the court held a final pretrial case management conference. The court clarified that, following the January 30, 2023, hearing, it ruled that "questioning regarding the brother is going to be fair game." However, it cautioned defendant, "[t]here may be some limits on it, but you're going to be allowed to ask," because the "general area is going to be fine." The State informed the court that it intended to play the video recording of VSI 1 immediately before J.V.'s testimony, rather than have her testify first. This would allow the State to question her regarding her failure to disclose the fact that her half-brother had sexually abused her during the same period as defendant. The State indicated it understood the peril involved because, if J.V. were unavailable for cross-examination, defense counsel would likely move to strike the video "and we would be looking at a directed finding." The court agreed that the law did not require that this evidence be presented in any particular order—only that the witness be available for cross-examination. Defendant had no objection "to the State taking that risk" of J.V. not testifying.

¶ 13                                                  B. The Trial

¶ 14    A jury trial was held over several days in February 2023. Just before trial, a sidebar discussion was held outside the jury's presence but not recorded by the court reporter. The trial court later made a record of what occurred during the sidebar. It explained that defendant orally moved to require the State, under the completeness doctrine, to play VSI 2 for the jury immediately after VSI 1. As part of the record, the court made clear that it denied the request because the completeness doctrine was inapplicable. It noted that the interviews occurred approximately one month apart and, therefore, did "not cover the context of a single statement, which is what the Doctrine of Completeness contemplates." However, the court reminded defendant that he could use VSI 2 for impeachment purposes if J.V. testified inconsistently with the statements she made during that interview.

¶ 15    During opening statements, the State provided an overview of some specific instances of abuse to which J.V. would testify. The State asserted that the evidence would show that defendant had sexually abused J.V., beginning when she was eight years old, and that the severity of the abuse increased as she aged. When J.V. was 12 years old, her mother, Ruth, began to notice that she was often tired and withdrawn. J.V. eventually confided in her that defendant had sexually abused her, including that he had sex with her in December 2021. The State also informed the jury that J.V. "was living with not one but two abusers," in that, "[a]round the same time defendant had sex with her in December, her older [half-]brother *** also started abusing her." The State explained that Ruth took J.V. to the hospital, where they learned that she was pregnant, "[b]ut it was not until a month later that everyone found out that it was her [half-]brother who got her pregnant." It also detailed that the night J.V. learned she was pregnant, she gave a recorded interview at the Lake County Children's Advocacy Center (Advocacy Center), where she "told the

interviewer best she could what her stepdad had done to her." It continued that, during her interview, J.V. did not state that her half-brother was also sexually abusing her because, in her young mind, "her brother's abuse was worse than her stepdad's abuse," and she "tried to shield her mom from what her son had done to her daughter."

¶ 16 In the defense's opening statement, trial counsel asserted that J.V. falsely accused defendant of sexually abusing her because she (1) did not like her stepfather; (2) missed her biological father; (3) feared her half-brother, who was the true abuser; and (4) wanted to protect her mother from the truth that her own half-brother impregnated her. Defense counsel also asserted that J.V. threw defendant "under the bus and falsely accus[ed] him of being the father of a child when we know for a fact he's not." Counsel asserted that the State was prosecuting defendant only because J.V. did not want to get in trouble for lying, and so she "stuck to the story" and refused to recant the allegations of sexual abuse against defendant when she learned the truth that defendant was not the source of the pregnancy. Counsel also referred to the contents of VSI 2 and emphasized J.V.'s hesitancy during that interview to implicate her half-brother.

¶ 17 The State's first witness was detective Lakesha Wilkerson of the Lake County sheriff's office. She was detailed as a forensic interviewer at the Advocacy Center. She described the Advocacy Center as a "community based[,] child-friendly environment where forensic interviews are conducted" of children regarding allegations of abuse. Wilkerson outlined her training and qualifications as a forensic interviewer and stated that she had conducted over 800 such interviews since 2015. She testified that victim sensitive interviews are conducted one-on-one in an interview room and are observed via a closed-circuit television by the "multidisciplinary team," which consists of "law enforcement, DCFS [(Department of Children & Family Services)], Assistant State's Attorney, medical, mental health and victim advocate[s]."

¶ 18    Wilkerson interviewed J.V. late in the evening on June 30, 2022. The State moved to publish VSI 1, and the 55-minute video was played for the jury without objection. During the interview, J.V. stated that she understood that she was being interviewed because she told her mother that her "stepdad touches [her]" and because she learned at the hospital that she was pregnant. J.V. stated that she did not "feel brave enough to tell her [mother] until" that day, and she detailed a series of incidents wherein defendant sexually abused her.

¶ 19    J.V. stated during her interview that defendant began to sexually abuse her when she was eight years old. The incidents usually occurred when defendant was drunk. He would "get on top of [her] and then just touch [her] body," with his hands, including on her "waist," "boobs," and the "private part" that girls "pee" with. Defendant used his hands to touch "all of" J.V.'s breasts with his hands, both over and under her clothes. J.V. detailed an incident that occurred "a little after [defendant], like, started touching" her, which occurred when she was still eight years old. Defendant called J.V. into his room and asked her for the name of the game she used to play with one of her friends. J.V. replied that the game was hide-and-seek, and defendant said they would play that game. Defendant pulled her onto the bed and, while they were under the covers, he touched her waist and boobs over her clothes.

¶ 20    J.V. informed Wilkerson that some of her siblings moved into the apartment after she turned nine years old, and defendant "stopped for a while because there were more people around." She reported that defendant's abuse eventually resumed, however, and it most frequently occurred after J.V. got home from school or on days she did not have school. She recalled an incident that occurred when she was 11 years old. After J.V.'s school day had ended, defendant was drunk and listening to music in his car. Defendant stated that his life was "difficult," and he was "always, like, stuck in nonsense." Defendant stated that, if she wanted to eat, they would have to eat in the

car. After they went home, J.V. went into her room and was on her phone for a while. J.V. eventually exited her room at the same time defendant exited his room, and they encountered each other in the hallway. Defendant "just grabbed [her] and started touching" her. "He was in front of [her] putting [her] up against the wall." Defendant touched J.V.'s body, waist, and buttocks over her clothes. He momentarily stopped touching her when J.V.'s half-brother entered the hallway, but defendant resumed touching and kissing her once her half-brother entered the bathroom.

¶ 21    J.V. also told Wilkerson that, during summer break when she was in fifth grade, defendant "wanted [her] to put [her] mouth on his private part." She explained that defendant sat her down on a chair in the kitchen, and he stood over her. Defendant's pants were down, and his hand was on his private part, which was "standing up." Defendant's private part was near "the top of [J.V.'s] mouth," but J.V. turned her head, "pushed him away," and told him to leave her alone. Defendant then "just let [her] go." J.V. told Wilkerson that defendant's private part did not enter her mouth.

¶ 22    During VSI 1, J.V. disclosed one act of sexual penetration during which he put his penis inside her vagina in December 2021. She explained that, after she got home from school, she went into her room to wait for either her mother or half-brother to get home because she did not feel comfortable being alone with defendant. Defendant was getting ready for work, and he called J.V. over to his room. When she entered defendant's room, he removed her clothes, grabbed her hand, and pulled her down to the bed. J.V. was on her back and defendant's clothes were off. Defendant "started touching [her] on [her] private parts, and that's when he put his private part inside." J.V. began to cry and tried to get defendant off of her, but she was unable to. Defendant told J.V. that he loved her, and that she should "stay quiet" and "not tell anybody." J.V. felt something warm come out of defendant's private part, after which defendant got off of her. She gathered her clothes

and went into her room, where she cleaned herself up and got dressed. J.V. stated that this was the only time that defendant penetrated her.

¶ 23    J.V. stated that the last time defendant touched her was on the morning of May 23, 2022, which was the day before the last day of school. J.V. explained that she was showering when defendant entered the bathroom, opened the shower curtain, and looked at her. J.V. was frightened and took a step back, and defendant stated that he was going to leave. J.V. exited the shower and got dressed in her room. After J.V. was dressed, defendant walked into her room. J.V. went on her computer and made up an excuse that she had homework to do "so that he would leave." Defendant became upset and accused J.V. of attempting to record him with her computer. Defendant closed the lid of her laptop and began to touch her "waist and [her] butt" on top of her clothes with his hands "all over."

¶ 24    J.V. reported to Wilkerson that she told a friend from school, E.S., that defendant was touching her. J.V. could not recall exactly when or where she told E.S., but she believed it was before the December 2021 incident. She recalled disclosing the abuse to E.S. after E.S. saw that she was upset and asked her what was wrong. J.V. stated that E.S. was the first person that she outcried to, with the second person being her mother, and that she had not told anyone else of the abuse.

¶ 25    After the video was played for the jury, Wilkerson's testimony resumed. Wilkerson conceded that she did not ask J.V. whether anyone else had inappropriately touched her, as she typically asks in interviews after abuse is disclosed. She did not ask the question because "it was late" and "the circumstances were a little different, [in that] it was a 12-year-old coming directly from the hospital just having found out she was pregnant." Wilkerson "figured we'd be talking

about how [J.V.] got pregnant." Wilkerson did, however, inquire whether there was anything else that J.V. wanted to tell her, and she replied in the negative.

¶ 26    The State next called J.V., who was 12 years old and in seventh grade at the time of her testimony. J.V. described the two-bedroom apartment where she lived, her five-minute walk to and from school, the relatives that lived with her, and her three cats. J.V. was then questioned regarding the June 30, 2022, outcry to her mother, Ruth. She testified that, at that time, she lived with her mother, sister, half-brother, and defendant. Ruth began to question her while J.V. was showering. Earlier that morning, J.V. was "a little upset," and her mother "noticed that [J.V.] was really tired." Ruth asked whether anyone had "ever touched" her, and J.V. replied in the affirmative. Ruth began to cry and inquired who had touched her. J.V. likewise began to cry and identified defendant as her abuser. J.V. asked her mother not to confront defendant because she feared that he would "try to run away, or he would get really mad."

¶ 27    J.V. further testified that her mother drove her to Vista Medical Center East hospital in Waukegan, where they learned that J.V. was pregnant. The police arrived and transported J.V. to the Advocacy Center, where Wilkerson interviewed her. J.V. conceded that she did not tell anyone at that point that her half-brother had done anything inappropriate to her because she "thought it was going to be a bigger deal *** to [her] mom." J.V. testified that she "thought it was going to hurt her [mother] finding out that her son, too, was doing this."

¶ 28    J.V. reiterated that she told the truth to her mother and Wilkerson "about the things that [her] stepdad had done," and she detailed the abuse at the hands of defendant. J.V. testified that defendant began to inappropriately touch her beginning when she was eight years old. At that time, just her, Ruth, and defendant lived in the home. Due to the work schedules of her mother and defendant, J.V. was often alone with defendant. Her mother would leave for work at 4:00 a.m. and

return between 4:30 and 5:00 p.m. Defendant would go to work at 3:30 p.m. and return at 4:00 a.m. Thus, when J.V. returned home from school at about 2:20 p.m., only defendant was present in the home. Likewise, J.V. was often alone with defendant on days when there was no school, such as during a school break.

¶ 29    J.V. testified that her first clear memory of defendant's abuse was of an incident that occurred when she was eight years old. She explained that, when no one else was home, defendant called her into his room and asked if she wanted to play hide-and-seek. J.V. agreed, although she did not know what defendant meant. While defendant was in bed and covered with a blanket, he pulled J.V. towards the bed "and like sort of like laid [her] down sideways facing him." Defendant "kept repeating 'I love you,' " and grabbed J.V.'s waist with his hands and "started rubbing *** his inappropriate part" against J.V.'s stomach. The incident lasted "around five minutes, at least," and defendant eventually allowed J.V. to leave after he saw that she was trying to get away from him. J.V. testified that she knew that he had done similar acts to her before this incident because she "sort of knew what was going to happen" when he summoned her to his room.

¶ 30    J.V. testified to another incident wherein defendant called her into his room. That time, he asked her to translate a message he had received from work into Spanish. J.V. translated the message, and defendant laid her down on the bed, lifted her shirt, and began to kiss her stomach and breasts. Defendant was "on the edge of the bed in front of [her] and kind of like kneeled down to [her] stomach." Defendant also used his hand to rub J.V.'s "inappropriate part," meaning the part that she uses to go "pee." She tried to push him away, but defendant "just kept doing it, and then, a while after he pulled [her] shirt back down and he started kissing [her] chest over [her] clothes." J.V. was eventually able to push defendant away, and she left the room.

¶ 31     J.V. testified that defendant touched her in this way "often," but these were the events that she had a memory of. Defendant would tell her not to tell her mother, and he continued to touch her similarly when she was nine years old.

¶ 32     J.V. testified that her sister and her half-brother moved in when she was nine, which made her feel "better because [she] wasn't alone in the house [any] more." Defendant's abuse "stopped for a while," but it resumed after her half-brother and sister got jobs, which increased the frequency of J.V. being left alone with defendant.

¶ 33     J.V. also testified to an incident in the kitchen during summer break after she completed fifth grade when she was 10. Defendant pulled her into the kitchen by her shoulder, sat her down on a chair in the middle of the kitchen, and attempted "to put his inappropriate part in [J.V.'s] mouth." She recounted that defendant lowered his pants and boxer shorts, held his "inappropriate part" with one hand and her shoulder with his other hand. Defendant was "walking towards [her] and trying to put his inappropriate part in [her] mouth." J.V. "kept facing to the sides trying to avoid it," and defendant's "inappropriate part just touched [her] lips, but [she] had [her] lips closed so it didn't go in." J.V. recalled that "the lights were off, and everything was silent," but she could hear the "fish tank in the living room, the water dropping." Defendant eventually ceased and told J.V. that she could leave. She went to her room and heard defendant retrieve a bottle of water from a pack of water bottles in the kitchen.

¶ 34     J.V. continued that, in December 2021, during her winter break from school, defendant had sexual intercourse with her. She testified that, when no one else was home, defendant called her into his room and asked her to pass him something in a drawer. Defendant was lying in bed, on top of the covers, wearing only boxer shorts. After J.V. handed defendant what he asked for, defendant moved to the edge of the bed, pulled J.V. to the bed by her hand, and sat her down.

Defendant told her to lie down, and "[he] pushed [her] down with his hands." Defendant "got on top of" J.V. and "just started rubbing his body against" hers, including "[h]is inappropriate part." She continued that "[h]is hands were pushing [her] hands down." J.V. testified that she tried to leave, but defendant "was grabbing [her] hands, and his legs were on the side of [her] so [she] couldn't move much." Defendant then lowered his boxers and rubbed his penis, skin to skin, against J.V.'s stomach. After several minutes, defendant pulled J.V.'s pants and underwear down to her ankles, and he placed his penis inside J.V.'s vagina. She was unable to push him off, and she began to cry. Defendant's penis was inside her vagina for "at least four minutes." He stopped "moving back and forth" after she "pushed him off," and he "fell to the side of" her. She did not notice whether anything came out of his penis. J.V. then stood and pulled her pants up, and defendant told her to clean herself with baby wipes. J.V. went into her room, used baby wipes to clean her "inappropriate part," changed her pants and underwear, and cried. After defendant used the bathroom, he apologized to J.V. and told her not to tell her mother.

¶ 35     J.V. next testified regarding an incident on May 23, 2022, before school. J.V. was showering when defendant "walked in," opened the shower curtain, and asked her how the water was. J.V. backed away and did not answer, and defendant left the bathroom. While J.V. was getting dressed, defendant attempted to enter her room, but she held the door closed by leaning against it with her back. After J.V. finished dressing, defendant entered the room. J.V. "just started doing homework on [her] computer because [she] wanted him to leave." Defendant became mad and stated that he knew her computer could record him. J.V. then picked up her phone and began to type a text message to her mother, but defendant took the phone from her and threw it to the ground. J.V. was seated on the bed and defendant sat next to her. He grabbed her waist and "kept *** rubbing his hands on [her] waist" and up to her breasts, on top of her clothing. J.V. kept

pushing defendant's hands away with her elbows. J.V. was crying, and she got up and put her computer in her backpack. Defendant told her not to go to school because she was crying, and he did not want anyone at school to see that she was upset. Defendant told J.V. to call her mother and state that she was sick. J.V. testified that the May 23, 2022, incident was the last time defendant sexually abused her.

¶ 36    J.V. also testified briefly regarding the sexual abuse she endured from her half-brother. She stated that the inappropriate touching by her half-brother "started in 2021" and that he began to have sexual intercourse with her "around the beginning" of 2022, which was after "defendant put his private part in [her] private part." Before her initial outcry to her mother and the subsequent forensic interview depicted in VSI 1, J.V. disclosed to several friends—namely, E.S., J.Va., and D.R.—that defendant had been inappropriately touching her. She explained that she did not tell any of these friends that her half-brother was sexually abusing her, because she "didn't want them *** to get involved in some of this stuff." J.V. conceded that she did not disclose during VSI 1 that she had also told J.Va. and D.R. about the abuse because she "didn't want to get them involved."

¶ 37    On cross-examination, J.V. agreed that she did not mention during VSI 1 that her half-brother was also sexually abusing her and that, during VSI 2, she was "very hesitant" to state that her half-brother also had sexual intercourse with her. She agreed that she "just wouldn't answer [the interviewer's] question about who else was touching" her, and she told the interviewer that it was "difficult for [her] to say" because her mother would be upset that she lied to her. Defense counsel did not ask her to clarify what she lied about. J.V. also agreed that it took approximately ten minutes of "questions and prodding" by the forensic interviewer before she "finally did say it was [her] brother." J.V. also testified that she recalled stating, during VSI 2, that she did not want

to get her half-brother in trouble and that she was afraid of him because he once grabbed her and would not let her go. Defense counsel also questioned J.V. regarding several inconsistencies between VSI 1 and her testimony at trial, including that she did not mention during VSI 1 either that defendant "was playing a game with [her] before he sexually abused" her, that he had called her into his room under the pretext of needing help with translating a message he received from his employer, or that he had lifted her shirt above her stomach and had kissed her breasts. Counsel also asked J.V. why, in her text message conversation with D.R., she stated that defendant sexually touched her "when" she was seven or eight, as opposed to "since" she was seven or eight. J.V. replied that she "just said like when—like around that age."

¶ 38    On redirect examination, J.V. clarified that, when she stated in VSI 2 and on cross-examination that she lied to her mother, she meant that she "lied to her about only one person doing this to [her]." She further testified that, during VSI 2, she informed the interviewer that she was truthful in her prior interview regarding the allegations of defendant's sexual abuse.

¶ 39    D.R., J.V.'s former boyfriend, testified next for the State. He testified that he had a text message conversation with J.V. on February 19, 2022, during which J.V. stated that defendant sexually touched her "when [she] was 7 or 8" and that she feared defendant would kill her if she told her mother. People's Exhibits Nos. 10 through 17, which consisted of screenshots of the text message conversation, were admitted without objection. The exhibits, which D.R. testified fairly and accurately reflected the text message conversation, state:

> [J.V.]: "Sorry I didn't answer fast its cuz my step dad came home [right now] he is drunk [as f***] I tried not to say s*** to him cuz he was like [I don't care] why you are scared of me when know damn [f***] well why I am and he said that when he calls me I'm scared to go in the room I just stayed quiet and he also said I have alw

[J.V.]: Damnn lmao that a lot

[J.V.]: But yeah

[D.R.]: Dam

[J.V.]: Yea he [nevermind]

[D.R.]: He what

[J.V.]: Um nothing

[J.V.]: Mk please dont tell anyone

[D.R.] Ok

[J.V.]: He sexualy touched me:

[J.V.]: *Sexually

[J.V.]: Like when I was 7 or 8 [crying face emoji] :(

[J.V.]: Please dont tell anyone

[D.R.] I won't but what what did ur mom do

[J.V.]: I um I haven't told her yet and he still lives with us

[D.R.] Tell her

[J.V.]: I just can't [I don't know] why I just can't speak up for myself he is just to dangerous he is capable of killing us if I tell her

[D.R.] Oh

[J.V.]: Yea don't tell anyone and don't bring it up to me if people are around

[J.V.]: And it's f*** sad bro my dad got deported and then my step dad doing that I have gone thru quite a bit

[D.R.]: Ok I won't I promise

[J.V.]: Ok I trust you [heart emoji]."

¶ 40    D.R. testified that J.V. had expressed fear of defendant in other text message conversations. However, the February 19, 2022, text message conversation was the only instance when J.V. stated defendant had inappropriately touched her. D.R. agreed that J.V. never told him that her half-brother had sexually abused her.

¶ 41    Following D.R.'s testimony, the State read the following stipulation to the jury:

> "IT IS HEREBY STIPULATED, by and between the parties, that Olegario Zelaya-Lopez, date of birth December 10th, 2001, the half[-]brother of [J.V.], had sexual intercourse with [J.V.] prior to June 30, 2022. That sexual intercourse resulted in [J.V.] becoming pregnant. On June 30, 2022, [J.V.] was approximately 19 weeks and five days pregnant. Olegario Zelaya-Lopez was arrested on July 26th, 2022, and charged with predatory criminal sexual assault of a child.
>
> IT IS HEREBY AGREED BY THE PARTIES."

¶ 42    Next, the State called J.V.'s mother, Ruth Lopez. She testified that at the time of J.V.'s outcry, seven people were living in her two-bedroom apartment—namely, Ruth, three of Ruth's children (including J.V.), her niece, her granddaughter, and defendant. Defendant, whom Ruth had been dating, moved into the apartment in 2017, when J.V. was five years old. Only she, J.V., and defendant lived in the apartment when defendant moved in.

¶ 43    Ruth was laid off from her job approximately one week before J.V.'s June 30, 2022, outcry. Before she was laid off, Ruth typically left for work at 4:30 a.m. and would return home at approximately 5:00 p.m. Defendant was a welder and typically left for work at 3:30 p.m. and would return home after 2:30 a.m. Defendant was often home alone with J.V. while Ruth was at work, including when J.V. would get home from school, as well as during summer break, winter break, and other days off from school. J.V.'s half-brother, sister, and her sister's child eventually moved

into the apartment when J.V. was 10 years old. Her half-brother "had a provisional [bed]room in the living room," and J.V. shared her room with her sister and her sister's child.

¶ 44    Ruth testified that, in the weeks preceding J.V.'s outcry, her demeanor was "sad" and she "wasn't eating right." On the morning of June 30, 2022, she was with J.V. in the bathroom while defendant was asleep. Ruth inquired what was wrong and said she could tell J.V. was upset. J.V. "just stayed sad, and she started to cry, but she wouldn't tell [Ruth] anything." Ruth feared that someone may have sexually assaulted her. Ruth persisted in questioning her as J.V. got into the shower because Ruth "could see that she was not okay." Ruth eventually opened the shower curtain and asked J.V. to "please tell [her] what's wrong." At that point, J.V. turned to her and, with tears in her eyes, stated, "it was Jorge, Mommy." Upon hearing this revelation, Ruth also began to cry, and J.V. asked her not to say anything to defendant. J.V. proceeded to detail "more about what [defendant] had done to her," including that "Jorge had gotten her in the room, that he got her naked, and that he threw himself on top of her." Ruth asked J.V. why she did not want her to confront defendant, and J.V. stated that she was "afraid" and that defendant "told [J.V.] not to tell anyone." Ruth further testified that J.V. "told [her] that he would touch her since she was eight years old." When J.V. finished showering, Ruth told her to go to her room and lie down, which she did.

¶ 45    Ruth further testified that she drove J.V. to the hospital that day. J.V. detailed more of defendant's abuse as they drove. Specifically, she said that "it would happen every time that they were alone and that he would touch her." J.V. stated that defendant "had touched her, that he had gotten her in the room. He was in the room and that he had called her and that he closed the door, got her naked, and got on top of her." Ruth asked J.V. if defendant put his penis inside her vagina when he was on top of her, and J.V. answered in the affirmative. J.V. specified that defendant had

touched her "many times," but that he penetrated her vagina "once *** in December" of 2021. J.V. also told her mother that "one day [defendant] touched her butt"; "one day [defendant] kissed her on the mouth"; and once defendant "hit [J.V.] on the butt," as she walked in the hallway. Ruth testified that "all this happened *** [s]ince she was eight ***, and he would touch her breast, and it wasn't until December when he abused her." Ruth further testified that she learned J.V. was pregnant while they were at the hospital. The doctors there called the police, who eventually transported Ruth and J.V. to the Advocacy Center, where J.V. was interviewed.

¶ 46 Detective Daniel Ramirez of the Waukegan police department testified regarding the investigation. Specifically, on the evening of June 30, 2022, he and Detective Lisandra Rodriguez responded to Vista Medical Center East in response to a report of sexual abuse of a 12-year-old. Upon his arrival, Detective Ramirez was briefed by Officer Martinez, who informed him that J.V. was pregnant. Detective Ramirez scheduled an emergency forensic interview for J.V. at the Advocacy Center. He and Detective Rodriguez transported Ruth and J.V. for the interview. After learning that J.V. implicated defendant during the interview, Ramirez arrested defendant at his workplace in the early morning of July 1, 2022. Officers Magpali and Martinez transported Ruth and J.V. back to the hospital to retrieve their vehicle, and they all proceeded to Ruth's apartment, where the officers took photographs of the scene. The apartment was not processed for "DNA, semen, [or] anything that might incriminate" defendant. Rather, Officers Magpali and Martinez took photographs of the home, "and that's as far as the scene was processed." Ramirez agreed that, because J.V. alleged defendant had sexually abused her over four years, including an incident in December 2021 when defendant allegedly placed his penis inside J.V.'s vagina, any attempt to retrieve DNA evidence from the home would have been futile.

¶ 47    Detective Ramirez further testified that, on July 26, 2022, he learned that DNA testing excluded defendant as the source of J.V.'s pregnancy, and he immediately scheduled a second forensic interview for J.V. After the interview, he learned that J.V.'s half-brother had also sexually abused her. He located and arrested him later that day.

¶ 48    J.Va., a classmate and friend of J.V., testified next for the State. She described being in an after-school club with J.V. and E.S. that met after school during the sixth grade. J.Va. testified that sometime around winter break of the 2021-2022 school year, she was in a breakout group with J.V. when she noticed that J.V.'s eyes were watery, and she was "fidgeting with her hands." J.Va. asked her what was wrong, and J.V. wrote something on a piece of notebook paper and handed it to her. J.Va. could not remember exactly what the note said, "but the meaning was that her stepdad was like doing stuff to her," which J.Va. took to mean "sexual stuff." She was certain that the note concerned J.V.'s stepfather and not her brother. After she read the note, J.Va. gave J.V. a hug, at which point J.V.'s eyes got "really watery." J.Va. inquired as to when her stepfather "started doing this to her," but she could not recall if J.V. answered her question. J.Va. told J.V. to tell her mother, to which J.V. responded that she was scared. J.Va. later told her parents that a classmate had confided that "her stepdad has been doing stuff to her," and her parents "told [J.Va.] to tell [J.V.] that she should *** talk to someone about it, like her mom or something." J.Va. did not talk to J.A. again about the note.

¶ 49    The State's final witness was E.S. She testified that J.V. was one of her best friends. They shared many of the same classes and were in the same after-school club that J.Va mentioned during her testimony. E.S. testified that she did not notice anything unusual about J.V. during the beginning of the 2021-2022 school year, but "around December [2021], like before winter break," she noticed that J.V. "looked sad and more upset." J.V. also was "becoming more distant," like

she "didn't want to come to school anymore." E.S. saw J.V. cry "sometimes [during] lunch, sometimes [during] math class."

¶ 50    E.S. testified regarding a conversation with J.V. in a school hallway in December 2021 or January 2022, as they waited for their after-school club to begin, J.V. was "fidgeting with her hands" and moving around and "looked really upset" from her facial expressions. E.S. asked what was wrong, but J.V. initially denied that anything was the matter. After further inquiry, J.V. began to cry and stated that her stepfather made her uncomfortable and that she did not like being around him. E.S. testified that J.V. then disclosed that her stepfather was touching her. J.V. "didn't want to" describe the incidents with specificity, but E.S. took her statement to mean "sexual touching." J.V. stated that the touching occurred when no one else was around. During the conversation, J.V. showed E.S. three photographs of her biological father and stated that she missed him because he had been deported. During their conversation, E.S. encouraged J.V. to tell her mother or the school counselor, but J.V. refused because she did not think anyone would believe her. J.V. also "begged [E.S.] not to tell the counselor." After school, E.S. told her mother about the conversation, and her mother suggested telling someone. E.S. "went to the counselor" the next day and "was going to tell her, but then [J.V.] met [her] outside" and "told [her] not to go." E.S. further testified that, in "maybe January or February" of 2022, J.V. again told her that she did not like being with her stepfather and felt uncomfortable around him. At one point during the school year, the name "Jorge" came up, and J.V. told her not to say that name, because it was her stepfather's name.

¶ 51    On cross-examination, E.S. agreed that, during her recorded interview at the Advocacy Center, she reported that J.V. was crying and holding a picture of her father when she approached J.V. She clarified during her testimony that J.V. "had the picture in her hand saying that she missed her dad; and then after, she told [E.S.] about how she didn't like being with her stepfather because

- 23 -

he made her uncomfortable." She clarified that J.V. did not start crying until she started to talk about her stepfather.

¶ 52    At the conclusion of E.S.'s testimony, the State rested.

¶ 53    Defense counsel moved for a directed verdict, emphasizing that defendant had not confessed to any wrongdoing and there was no forensic evidence. In defendant's view, the State's case depended entirely on J.V.'s credibility, which was impeached with prior inconsistent statements, and there was "proof positive" that defendant was not the source of J.V.'s pregnancy. Counsel argued that "the only reason that we're here is that [J.V.] chose not to recant her allegations" regarding defendant after it was conclusively determined that he was not the source of the pregnancy. The court denied the motion, noting that, for purposes of the motion, it was required to view the evidence in the light most favorable to the nonmovant.

¶ 54    Defendant, during his case-in-chief, presented a video clip of E.S.'s interview at the Advocacy Center to impeach E.S.'s testimony concerning when J.V. began to cry during their conversation. In allowing defendant to impeach E.S. with the video, the court noted, outside the presence of the jury, that E.S. testified at trial that J.V. began to cry when she stated defendant had touched her inappropriately but, in the interview, E.S. "appear[s] to say that [J.V. was] already crying" and was holding a photo of her biological father when E.S. approached her. The court explained that "the purpose in which I'm allowing [defendant] to play this part is to impeach [E.S.] about the order in which the conversation took place." Defendant played a portion of E.S.'s interview for the jury. Defendant then rested.

¶ 55    Following closing arguments, the jury found defendant guilty on all five counts.

¶ 56                         C. Posttrial Proceedings

¶ 57    On March 23, 2023, defendant filed a motion for acquittal or a new trial. He raised four arguments: (1) the evidence was insufficient to support the verdict because J.V. was not credible; (2) the court violated defendant's sixth amendment rights when it barred him from questioning Ruth regarding her application for nonimmigrant status, which was premised upon her cooperation in defendant's prosecution; (3) his rights under the equal protection clause of the fourteenth amendment were violated because the State presented no independent evidence of his guilt, but the *corpus delicti* rule would have required the State to offer such evidence if defendant had confessed to the offenses; and (4) the trial court should decline to follow *People v. Schott*, 145 Ill. 2d 188 (1991), and require independent corroboration of J.V.'s allegations. Defendant referenced VSI 2 and J.V.'s cross-examination regarding the same at trial, but he did not raise any issue regarding the court's pretrial ruling regarding the completeness doctrine.

¶ 58    On April 6, 2023, the trial court heard oral argument on defendant's posttrial motion. Defendant referenced certain inconsistencies between VSI 1 and VSI 2. However, he made no argument that the court erred in denying his request to require the State to play VSI 2 immediately after VSI 1. Likewise, defendant did not argue that he was precluded from introducing VSI 2 at trial. The court denied defendant's motion.

¶ 59    The trial court then proceeded to sentencing and entered judgment on all five counts. Defendant provided the court with several character letters on his behalf, and he made a statement in allocution proclaiming his innocence. The court sentenced defendant to 35 years in the Illinois Department of Corrections, followed by 3 years to life of mandatory supervised release.

¶ 60    On April 12, 2023, defendant timely filed a notice of appeal.

¶ 61                              II. ANALYSIS

¶ 62    Defendant raises two arguments on appeal. First, he contends that the trial court erroneously applied the completeness doctrine and, as a result, denied him a fair trial because the court's ruling precluded the jury from a full exposition of J.V.'s section 115-10 statements (meaning VSI 2) and allowed the jury to be misled. Second, defendant argues that his trial counsel was ineffective for failing to seek admission of VSI 2 during the defense's case-in-chief. Defendant asks that we reverse his conviction, order a new trial, and require that the trial court admit VSI 2 at retrial. We address defendant's arguments in turn.

¶ 63            A. The Completeness Doctrine and Illinois Rule of Evidence 106

¶ 64    Defendant first argues that the trial court denied him a fair opportunity to present his defense and, thus, deprived him of his right to due process, when it denied his request, under the "completeness doctrine," to require the State to play VSI 2 immediately after VSI 1. He maintains that Illinois Rule of Evidence 106 (eff. Jan. 1, 2011) both codified and expanded the common law doctrine. Further, he argues that the trial court erred in "failing to account for the change" that Rule 106 made to the common law doctrine, in that Rule 106 "allows for the admission of statements that were not made at the same time" as the writing or statement already admitted into evidence.

¶ 65    Defendant emphasizes that his success at trial depended on his ability to cast doubt on J.V.'s credibility by demonstrating that she had a motive to falsely implicate him in the sexual abuse she described in VSI 1 and as the source of her pregnancy. He acknowledges that J.V. testified at trial regarding her statements in VSI 2, wherein J.V. was informed that scientific testing excluded defendant as the source of the pregnancy, and she divulged that her half-brother had likewise had sexual intercourse with her. Nevertheless, defendant asserts that J.V.'s trial testimony "was no substitute for the video recording that the court blocked the jury from seeing," because the value of VSI 2 to defendant's case was not just in what J.V. said, but *how* she said it. According

to defendant, "the victim agonizing [during VSI 2] about whether she should tell the forensic interviewer about her [half-]brother is what the jury was deprived of seeing." Defendant notes that, because VSI 2 was not published, the jury was unable to observe her body language, eye contact, vocal nuances, and other non-verbal cues at the moment the forensic interviewer informed her that defendant was excluded as the source of her pregnancy. Defendant complains that the jury had answers to these questions with respect to VSI 1 and J.V.'s in-person testimony, but the court's ruling "stripped the jury of the opportunity to have answers [to] these questions with respect to" VSI 2, which was "the most critical part of the entire incident." Although J.V. was cross-examined regarding her initial failure to disclose her half-brother's abuse during VSI 1 and her reluctance to implicate him during VSI 2, defendant asserts that J.V.'s testimony was a "sanitized version" of the truth because, by the time of trial, J.V. "had seven months to regroup, reflect, and prepare her testimony with prosecutors."

¶ 66    The common law "completeness doctrine," also called the "rule of completeness," provides that if one party introduces part of an utterance or writing, the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper context, so that a correct and true meaning is conveyed to the jury. *People v. Ruback*, 2013 IL App (3d) 110256, ¶ 43. In other words, "the opposing party has a right to bring out the remainder of that conversation to prevent the trier of fact from being misled." *People v. Ward*, 154 Ill. 2d 272, 311 (1992). The common law completeness doctrine applies to conversations and writings (*Herron v. Anderson*, 254 Ill. App. 3d 365, 375-76 (1993)), as well as recordings (*People v. Williams*, 109 Ill. 2d 327, 334-37 (1985)).

¶ 67    The " 'admission of evidence under the [completeness] doctrine is limited to that which is relevant, material, and concerns the same subject at the same time.' " (Emphasis omitted.) *Ward*,

154 Ill. 2d at 312 (quoting *People v. Barlow*, 188 Ill. App. 3d 393, 411 (1989)). It is intended to (1) prevent the trier of fact from being misled, (2) place the admitted portion of the statement in its proper context so that a correct and true meaning is conveyed to the jury, and (3) further explain the meaning of the evidence already received. *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 85. See *People v. Nolan*, 291 Ill. App. 3d 879, 885 (1997) ("The purpose of the rule of completeness is to correctly convey the true meaning of a statement to the triers of fact."); see also *Rodriguez v. Northeast Illinois Regional Commuter R.R. Corp.*, 2012 IL App (1st) 102953, ¶ 71 (the additional material "must relate to the same subject matter as the original and tend to explain, qualify, or otherwise shed light on the meaning of the part already introduced," and is "admissible when necessary to prevent the jury from receiving a misleading impression of the nature of the original" material). "[T]he right to bring out all of a conversation is not absolute, but depends upon the *relevancy* of the additional parts of the conversation the party wishes to introduce." (Emphasis in original.) *Williams*, 109 Ill. 2d at 335. Application of the completeness doctrine is within the trial court's sound discretion. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 41; *Rodriguez*, 2012 IL App (1st) 102953, ¶ 71.

¶ 68 An analogous concept is found in Illinois Rule of Evidence 106 (eff. Jan. 1, 2011). The rule provides that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *Id*. The rule "is not a means to admit evidence that aids a defendant in proving his or her theory of the case," but rather, is intended "to correct the misleading nature of a writing or recorded statement or a portion thereof that has been taken out of context or is difficult to understand on its own." *Craigen*, 2013 IL App (2d) 111300, ¶ 48. If a defendant does not show "that the admitted writing

or recorded statement, standing alone, is misleading, Rule 106 does not provide an avenue for admitting another writing or recorded statement." *Id.*

¶ 69 As this court previously observed, Rule 106 codified, at least in part, the common law completeness doctrine. *Id.* ¶ 42. However, despite considerable overlap between the rule and the common law doctrine, several key differences remain. For example, the completeness doctrine applies to oral statements, writings, and recorded statements, whereas Rule 106 applies only to writings and recorded statements, but not oral statements. *Id.* There are also timing differences. The common law completeness doctrine "does not have a timing requirement" (*Fakes*, 2014 IL App (4th) 121100, ¶ 88), and opponents who wish to introduce the remainder of an incomplete statement may do so either on cross-examination or through the presentation of their own evidence or witnesses (*Williams*, 109 Ill. 2d at 334-35; *Nolan*, 291 Ill. App. 3d at 885). Conversely, Rule 106 "permits an opposing party to 'require the introduction *at that time* of any other part or any other writing or recorded statement which ought in fairness to be considered *contemporaneously* with it.' " (Emphases in original.) *Craigen*, 2013 IL App (2d) 111300, ¶¶ 42 (quoting Ill. R. Evid. 106 (eff. Jan. 1, 2011). Moreover, the "ought in fairness" requirement in Rule 106 allows for the admission of writings or recordings that were not made at the same time as the evidence previously admitted (*id.*), whereas, as noted above, the common law doctrine applies only to "what was said on the same subject at the same time" (*Ruback*, 2013 IL App (3d) 110256, ¶ 43).

¶ 70 Preliminarily, defendant concedes that he forfeited review of this issue because, although he argued at trial that he should have been allowed to play VSI 2 immediately after VSI 1 was played, he did not raise the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988) (to preserve an issue for appellate review, a defendant must raise the issue at trial and in a posttrial motion). Forfeiture notwithstanding, defendant argues that we may review the issue

under the plain-error doctrine or as a claim for ineffective assistance of counsel because it fell within the constitutional exception to the rape shield statute and implicated his right "to present a full-throated defense consistent with the constitution."

¶ 71    At the outset, we note that defendant's forfeiture actually runs deeper than a simple failure to raise the issue again in a written posttrial motion. Contrary to the representations in his appellate briefs, defendant did not argue in the court below that VSI 2 was admissible pursuant to Rule 106. The report of proceedings does not include the verbatim sidebar discussion during which defendant orally moved the court to require the State to publish VSI 2. However, the trial court made an adequate record summarizing the parties' respective positions, the court's ruling, and the reasons therefor:

> "THE COURT: I did speak to the attorneys off the record a moment ago regarding the two victim sensitive interviews about a month apart, the second of which came up after the DNA test showed that the father of the child being born [*sic*] by the complaining witness was the brother and not the defendant.
>
> Mr. Guzman, Mr. Farr [*sic*] [(defense counsel)], it's indicated that he believed that the State should be required to play both the VSI's, victim sensitive interviews—sorry— under the Doctrine of Completeness.
>
> I indicated that, and the State objects to that. I indicated that I do not believe that the second interview, because it was not the same day—it was a month apart—would be covered by the Doctrine of Completeness because it would not cover the context of a single statement, which is what the Doctrine of Completeness contemplates.

The Doctrine does not allow all prior statements made, even if there are inconsistencies between the statements. And that's a matter of discretion with the Court, but that's what I believe.

I did indicate to the defense that should, under cross examination, the complaining witness say something different than said in that second interview, that the defense will be allowed to impeach the witness with that second interview. So, they'll be allowed to show any prior inconsistent statements. Is that the way the conversation went?

MR. ZERMENO [(ASSISTANT STATE'S ATTORNEY)]: Yes.

MR. FERRIS: [(DEFENSE ATTORNEY)]: Yes.

¶ 72 Based on the above, it is clear that defendant did not move to admit VSI 2 pursuant to Rule 106. Instead, he relied exclusively on the common law completeness doctrine, which, as we have explained, is similar but not identical to the rule. The court, in concisely summarizing the parties' respective positions, noted that defendant's argument was premised on "the doctrine of completeness," and it did not mention any request by defendant under Rule 106. Defendant also answered in the affirmative when the court asked him whether it had accurately described his argument and position. Had defendant truly made a "request under Rule 106," as he asserts in his brief, the court would neither have cited the one-month gap as a basis for denying said request nor emphasized that the completeness doctrine allows for the admission of the remainder of a conversation only if it occurred within the "the context of a single statement." See *Ruback*, 2013 IL App (3d) 110256, ¶ 43. Moreover, the trial court certainly would have referenced Rule 106. The above colloquy thus does not reflect the court's "outdated understanding of Rule 106," as defendant argues, but instead demonstrates that the trial court correctly ruled upon the exact point of law that defendant raised. See *People v. Viramontes*, 2021 IL App (1st) 190665, ¶ 56 (noting

that, for the completeness doctrine to apply, the statement to be admitted must concern what was said on the same subject at the same time). Undeniably, VSI 1, which occurred on June 30, 2022, and VSI 2, which occurred on July 26, 2022, were separate events, and J.V.'s statements during these distinct interviews necessarily were not made at the *same time*.

¶ 73    Defendant cannot now claim error on appeal for receiving a ruling in the trial court that addressed only the grounds he invited. See *Brooke Inns, Inc. v. S&R Hi-Fi & TV*, 249 Ill. App. 3d 1064, 1086 (1993) ("Generally, the proponent of excluded testimony is limited on appeal to the grounds for admissibility raised in the circuit court."); see also *People v. Terrell*, 185 Ill. 2d 467, 507 (1998) ("[a]n objection to evidence on specified grounds waives on appeal any alternative objections not specified"); *People v. Enis*, 139 Ill. 2d 264, 294 (1990) ("an objection based upon a specified ground waives all grounds not specified, and a ground of objection not presented at trial will not be considered on review"). A defendant's failure to object at trial deprives the trial court of the opportunity to correct the error, and a defendant's failure to object in a written posttrial motion deprives the reviewing court of the factual findings that the trial court might have made regarding the effect of the alleged error on the weight of the evidence presented against defendant. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50. Defendant's Rule 106 argument is, therefore, procedurally defaulted, not just for his failure to raise it in a posttrial motion, but also because he failed to raise it in the trial court at all. See *Enoch*, 122 Ill. 2d at 186 ("both a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review").

¶ 74    Having clarified this point, we now turn to defendant's request that we excuse his forfeiture and review his underlying claim for plain error. The plain-error doctrine operates as a narrow and limited exception to the general rule of procedural default (*People v. Hillier*, 237 Ill. 2d 539, 545 (2010)), which is designed to protect the defendant's rights and the integrity of the judicial process

(*People v. Herron*, 215 Ill. 2d 167, 177 (2005)). "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). It does not allow for the review of all forfeited errors but, rather, only those errors that fall under one of two alternative prongs: (1) "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence," or (2) "when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Jackson*, 2022 IL 127256, ¶ 19. Under either prong, the burden of persuading the court to excuse the forfeiture rests with the defendant. *Id.*

¶ 75    The State counters that, even if error occurred, plain-error review is unavailable because defendant " 'invited' or acquiesced" to the error. It argues that any alleged error resulting from the jury not viewing VSI 2 is attributable, not to the court's ruling concerning the completeness doctrine but, rather, to defendant's choice not to publish VSI 2 during his own case-in-chief. We agree with the State.

¶ 76    It is well established that, where a party acquiesces in proceeding in a particular manner, "he is not in a position to claim he was prejudiced thereby." (Internal quotation marks omitted.) *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001). This concept, known as the doctrine of invited error or acquiescence, provides that "a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60. It is a procedural default sometimes referred to as an "estoppel." *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). The active participation in the direction of the proceedings "goes beyond mere waiver." *Villarreal*, 198 Ill. 2d at 227. The rationale behind the doctrine of invited error or acquiescence is that it would be manifestly unfair to allow a party

to have a second trial based upon error which that party injected into the proceedings. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "To permit a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal would offend all notions of fair play [citation], and encourage defendants to become duplicitous [citation]." (Internal quotation marks omitted.) *Harvey*, 211 Ill. 2d at 385. Where a defendant has invited or acquiesced to the error, our supreme court has declined to review any related plain-error claim. See, *e.g.*, *People v. Patrick*, 233 Ill. 2d 62, 76-77 (2009); see also *People v. Bowens*, 407 Ill. App. 3d 1094, 1104 (2011) (observing that plain-error review applies to procedural-default cases, not affirmative acquiescence).

¶ 77    Here, if indeed any error occurred, defendant acquiesced to the error. Defendant's argument that he was denied a fair trial rests upon the flawed premise that the trial court precluded the jury from viewing VSI 2. As the State correctly observes, defendant expresses this erroneous assumption repeatedly throughout his opening brief. For instance, defendant rhetorically asks, "[w]hat reason did the court have for preventing the jury from seeing VSI #2?" He continues that "the court only let the jury see half of the [section] 115-10 statements made by the victim," which "deprived [the jury] of seeing" her "agonizing about whether she should tell the forensic interviewer about her [half-]brother." Defendant similarly asserts that "[i]nstead of allowing the defense to shed light on the victim's motive to lie and bias, the court kept the jury in the dark." It allowed the State "to skip over reference to VSI #2 because the court excluded it under the completeness doctrine," and it otherwise "blocked the jury" from viewing it. He continues that "the court stripped the jury of the opportunity" to view VSI 2.

¶ 78    The trial court made no such ruling, and defendant's argument in this portion of his brief reflects an attempt to blame the trial court for his counsel's ultimate decision not to play VSI 2 for

the jury when he had the opportunity to do so during his own case. The court indeed denied defendant's pretrial request under the common law completeness doctrine to publish VSI 2 immediately following VSI 1 in the State's presentation of the evidence. However, that ruling did not circumscribe his ability to present this evidence later at trial, as part of his own case.[1] As defendant recognizes in his own ineffective assistance of counsel claim, which we will address below, "all of the [section] 115-10 evidence, including VSI #2, was fair game for the Defense to use in its own case-in-chief," but "[d]efense counsel failed to use that opportunity." Rather, the court denied counsel's request to publish VSI 2 during the State's case-in-chief under the completeness doctrine and then "counsel dropped this critical issue altogether." Thus, defendant's own appellate brief recognizes that it was not the trial court that "precluded the jury from a full exposition of the victim's 115-10 statements," meaning VSI 2, but the decision of his counsel not to play it during defendant's case-in-chief, when he could have but opted not to. The record does not suggest that the court would have barred defendant from playing the salient portions of VSI 2, including "the victim agonizing about whether she should tell the forensic interviewer about her [half-]brother," had defendant simply offered this evidence during his presentation of the evidence. Instead, when it was his turn to present witnesses and evidence, defendant opted only to play a video clip from E.S.'s forensic interview to impeach her trial testimony regarding when J.V. began to cry, and he then rested his case. Defendant's decision not to publish any portion of VSI 2 during his presentation of the evidence, when he concedes he could have done so, effectively superseded

---

[1]Defendant makes no timing-related argument that the court's refusal to require the introduction of VSI 2 immediately after VSI 1 caused him any prejudice. Rather, his argument on appeal relates to the total absence of VSI 2 from the jury's consideration.

any purported error by the trial court and foreclosed the application of the plain-error doctrine. See *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17 ("[P]lain-error review is forfeited when the defendant invites the error."); see also *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12 (plain-error review applies to cases involving procedural default, not affirmative acquiescence). "When defense counsel affirmatively acquiesces to actions taken by the trial court, any potential claim of error on appeal is waived, and a defendant's only available challenge is to claim that he received ineffective assistance of counsel." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29. Accordingly, plain-error review of defendant's claim is unwarranted.

¶ 79    Forfeiture aside, we take this opportunity to emphasize that, even if defendant had sought admission of VSI 2 pursuant to Rule 106, the trial court would have been well within its discretion to deny the motion. As we explained in *Craigen*, "the purpose of Rule 106 is to correct the misleading nature of a writing or recorded statement or a portion thereof that has been taken out of context or is difficult to understand on its own." *Craigen*, 2013 IL App (2d) 111300, ¶ 48. It "is not a means to admit evidence that aids a defendant in proving his or her theory of the case." *Id.* At trial, the State read the parties' stipulation to the jury, which provided:

"IT IS HEREBY STIPULATED, by and between the parties, that Olegario Zelaya-Lopez, date of birth December 10th, 2001, the half[-]brother of [J.V.], had sexual intercourse with [J.V.] prior to June 30, 2022. That sexual intercourse resulted in [J.V.] becoming pregnant. On June 30, 2022, [J.V.] was approximately 19 weeks and five days pregnant. Olegario Zelaya-Lopez was arrested on July 26th, 2022, and charged with predatory criminal sexual assault of a child.

IT IS HEREBY AGREED BY THE PARTIES."

The stipulation, and the fact that the pregnancy was not caused by defendant, but by J.V.'s half-brother, were likewise emphasized by the parties during their respective opening statements. Therefore, the jury had been repeatedly informed of J.V.'s "lie by omission" before viewing VSI 1. As a result, the jury was well aware that defendant was not the source of the pregnancy when it viewed J.V. discuss the pregnancy and her allegations against defendant in VSI 1. The parties' stipulation and their respective opening statements equipped the jury with the truth and eliminated the danger that it would be misled without viewing VSI 2.

¶ 80                           B. Ineffective Assistance of Counsel

¶ 81     Notwithstanding our determination that defendant acquiesced to the trial court's error (if any) such that plain-error review is unavailable, his challenge may still be considered as a claim for ineffective assistance of counsel. *Villarreal*, 198 Ill. 2d at 228.

¶ 82     On appeal, defendant argues that his trial counsel rendered ineffective assistance by failing to introduce VSI 2 during his own case-in-chief. He states that his counsel initially moved to publish VSI 2 during the State's case-in-chief and, although the court denied the request at that juncture, "all of the [section] 115-10 evidence, including VSI #2, was fair game for the Defense to use in its own case-in-chief under the Court's January 30, 2023, order." Defendant continues that "counsel failed to use that opportunity, and that failure constituted ineffective assistance of counsel." Defendant contends that his defense hinged on undermining J.V.'s credibility and demonstrating that she had a motive to falsely implicate him as her abuser and the source of the pregnancy because she wanted to shield her mother from the truth that J.V.'s half-brother had abused and impregnated her. In defendant's view, VSI 2 "unlocked valuable insight into all of those issues," but after counsel's request under the completeness doctrine was denied, "counsel dropped this critical issue altogether."

¶ 83    A defendant is guaranteed the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In reviewing a claim of ineffective assistance of counsel, we apply the familiar two-part test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted in Illinois in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). To prevail on an ineffective-assistance-of-counsel claim, a defendant must show that his attorney's assistance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Curry*, 178 Ill. 2d 509, 518-19 (1997). In other words, a defendant must show deficient performance and that the deficient performance resulted in prejudice. *People v. Johnson*, 2021 IL 126291, ¶ 52. A defendant is entitled to competent, not perfect, representation; mere errors of judgment or trial strategy do not establish incompetency of counsel or deny due process. *People v. Ortiz*, 155 Ill. App. 3d 786, 794-95 (1987).

¶ 84    Matters of trial strategy are immune from ineffective-assistance-of-counsel claims on appeal, and reviewing courts make every effort to evaluate counsel's performance from his or her perspective at the time, rather than through the lens of hindsight. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 93 (citing *People v. Perry*, 224 Ill. 2d 312, 344 (2007)). A mistake in trial strategy or error in defense counsel's judgment, without more, will not render counsel's representation ineffective. Decisions pertaining to trial strategy, including which witnesses to call and what evidence to present, rest with trial counsel. *People v. Leeper*, 317 Ill. App. 3d 475, 482 (2000). "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *People v. Peterson*, 2017 IL 120331, ¶ 80. A reviewing court gives great deference to trial strategy decisions and evaluates counsel's performance from counsel's perspective at the time of trial and not in

hindsight. *Perry*, 224 Ill. 2d at 344. There is a strong presumption that counsel's challenged conduct was within the range of reasonable professional assistance, and the burden is on defendant to overcome this presumption. *Strickland*, 466 U.S. at 689. We review claims of ineffective assistance of counsel by considering the entire record. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9 (citing *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010)).

¶ 85 Defendant has not overcome the strong presumption that his counsel's decision not to publish VSI 2 during the defense's case-in-chief was the product of sound trial strategy. Defendant fails to recognize that the fluid nature of criminal trials means that counsel's pretrial plans may no longer be the optimal way to proceed once it is the defendant's turn to present evidence. Here, by the time defendant had an opportunity to present his case, there would have been little reason to seek admission of VSI 2. Had the jury viewed the pertinent portions of VSI 2 during the defense's case-in-chief—namely, J.V.'s reluctance to reveal the sexual abuse at the hands of her half-brother, counsel would have run the risk of generating additional sympathy for her in the eyes of the jury. Additionally, not only did J.V. not recant, in VSI 2, any of the allegations of sexual abuse against defendant, but she affirmatively stated that she was truthful in VSI 1 regarding defendant's abuse. Moreover, she provided further details regarding several specific incidents of sexual abuse that she discussed in VSI 1. In light of the evidence already presented by the State, the record demonstrates that defense counsel effectively and competently reevaluated his trial strategy and opted not to present VSI 2 during the defense's case-in-chief. By refraining from playing VSI 2, defense counsel avoided the redundancy and unnecessary emphasis on the underlying allegations and minimized the harm the repetition of those allegations would have caused to defendant's case.

¶ 86 Again, defendant's case focused on undermining the credibility of J.V. and demonstrating that she had a motive to lie because she wanted to spare her mother the heartbreak of knowing that

the allegations of sexual abuse that J.V. pinned on defendant were actually perpetrated by J.V.'s half-brother. VSI 2 was not necessary to present that defense and, indeed, this theory of the case was presented to the jury through the cross-examination of the State's witnesses and the parties' stipulation. Defense counsel cross-examined J.V. regarding (1) her failure in VSI 1 to disclose that her half-brother had sexually abused her; (2) the fact that, in VSI 2, it took her nearly ten minutes to ultimately divulge that her half-brother had sexually abused her; and (3) her statement in VSI 2 that her mother would be upset because she lied to her. Counsel also attempted to impeach J.V. regarding inconsistencies between VSI 1 and her trial testimony, as well as attempting to impeach her with text messages that she sent D.R., her ex-boyfriend, where she stated defendant had sexually abused her "when" she was eight years old and not "since" she was eight. Defense counsel, through cross-examination, effectively impeached J.V. without playing VSI 2, which would have reaffirmed defendant's criminality. Because defendant failed to establish that his counsel's strategic decision constituted deficient performance under *Strickland*, his ineffective assistance of counsel claim necessarily fails. *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 87                                   III. CONCLUSION

¶ 88     For the above reasons, we affirm the judgment of the circuit court of Lake County.

¶ 89     Affirmed.

*People v. Hernandez-Chirinos*, **2024 IL App (2d) 230125**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 22-CF-1100, the Hon. George D. Strickland, Judge, presiding. |
| **Attorneys for Appellant:** | Jason S. Dreifuss, of Waukegan, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |