2025 IL App (2d) 230405-U
No. 2-23-0405
Order filed February 7, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 19-CF-1593 |
| JOSE TAMAYO, | ) ) ) | Honorable Salvatore LoPiccolo, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant forfeited the issue of the mother's testimony about a victim's suicide attempt, and his stipulation to the challenged testimony constituted invited error precluding our consideration under plain error; likewise, defendant could not demonstrate prejudice from the challenged testimony for purposes of claiming ineffective assistance of counsel. Defendant's challenge to one victim's out-of-court statements to the mother were also forfeited, and defendant was unable to demonstrate the requisite prejudice for purposes of plain error and ineffective assistance analyses.

¶ 2    Defendant, Jose Tamayo, appeals his convictions, following a jury trial in the circuit court of Kane County, of predatory criminal sexual assault of a child (720 ILCS 5/11-14(a)(1) (West 2018)) and aggravated criminal sexual abuse (*id.* § 11-1.60(b)). On appeal, defendant challenges two of the trial court's evidentiary rulings. Specifically, defendant argues that the trial court

abused its discretion by admitting evidence of a suicide attempt purportedly attributed to one of the victims, M.T., along with her out-of-court statements to her mother, A.T., pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2022)). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This case arose from statements defendant's daughters, M.T. (born in November 2010) and D.T. (born in July 2009), made to their mother, A.T., and to investigators. On September 25, 2019, defendant was indicted with two counts of predatory criminal sexual assault of M.T. (720 ILCS 5/11-1.40(a)(1) (West 2018)) (digital penetration of sex organ (count I), touching of sex organ (count II)); one count of predatory criminal sexual assault of D.T. (*id.*) (touching of sex organ (count III)); two counts of aggravated criminal sexual abuse of M.T. (*id.* § 11-1.60(b)) (touching of sex organ (count IV)), touching of buttocks (count V)); and three counts of aggravated criminal sexual abuse of D.T. (*id.*) (touching of buttocks (count VI), touching of sex organ (count VII), touching of chest (count VIII)). The indictment alleged that the offenses occurred between November 23, 2017, and June 12, 2019.

¶ 5      On February 19, 2020, the State filed a notice of intent to introduce the victims' out-of-court statements pursuant to section 115-10 of the Code, and, on December 7, 2020, it filed an amended notice of intent. The State sought to introduce the July 11, 2019, video-recorded interviews between M.T. and D.T. and Susan Salinas Ramirez (the forensic interviewer); M.T.'s June 2019 statements to her mother, A.T., Robert Collins (A.T.'s husband), and Fatima Nuthana (an older sister and A.T.'s child); and D.T.'s June 2019 statements to A.T., Collins, and Nuthana.

¶ 6      On December 21, 2020, and April 15, 2021, the trial court held the hearing on the State's notice of intent to admit out of court statements pursuant to section 115-10 of the Code (section

115-10 hearing). A.T. testified[1] that, during the summer of 2019, M.T., D.T., and T.T., their older sister, were all staying at her home with her husband, Collins. On June 12, 2019, M.T. and D.T. were showering, and A.T. checked on their progress. M.T. was seated on the toilet, naked, with her legs open, waiting for her turn in the shower. A.T. noticed that M.T.'s vagina was "real red" and looked unusual, so she began to question M.T., asking if there was anything M.T. wanted to tell her and "if anyone had touched her," because A.T. had an intuition that "something was going on." M.T. began to cry and told A.T. that defendant was drunk one night and put his finger in her vagina while M.T. was sleeping on the downstairs couch in Yolanda's apartment. M.T. told A.T. she woke up, ran upstairs, and told her sisters.

¶ 7     A.T. testified that she called the family into the dining room and questioned M.T., D.T., and T.T. together. A.T. asked M.T. to repeat what she had told A.T. in the bathroom to her sisters. After this, A.T. asked T.T. and D.T. if anything similar had happened to them. D.T. stated that defendant had touched her "private parts" over her clothes and, a "couple" times while she was dressing, had touched her vagina. T.T. denied that defendant had touched her and "was screaming at the other two." During the commotion, M.T. was crying, and A.T. continued to question her, asking, " 'Is this true, is it true, please,' " because "it was like so hard to believe."

¶ 8     The examination turned to a note that M.T. had given A.T. after the dining room meeting. A.T. revealed one or more of her children had attempted suicide, but the record is not altogether clear about whom she was speaking. On direct examination, the following colloquy about the note occurred:

---

[1]A.T.'s testimony was taken during the April 2021 hearing.

"[MR. RODGERS (ASSISTANT STATE'S ATTORNEY)]: Q. [A.T.], I just want to ask you: At some point, did [M.T.] write something down on a piece of paper related to what she had disclosed to you?

[A.T.] A. Yeah. She says she couldn't—uhm—really talk about it so she wrote it and she gave it to me.

Q. When did that occur that she wrote that down?

A. Uhm—a couple days during what was going on—uhm—it was like a couple days like after the situation I think, and—

Q. So a couple days after June 12th?

A. [Yes.]

Q. And that's when she told you that she wanted to write down something?

A. Yeah, because my kid tried to kill herself.

Q. And did you watch her write it down, or—

A. No, she brought it to me."

The note was admitted in the section 115-10 hearing without objection.

¶ 9    On cross-examination of A.T., defense counsel appeared to clarify that T.T. was the child who tried to kill herself:

"[MR. RIOS (DEFENSE COUNSEL)] Q. [During the dining room meeting, T.T. denied that defendant had touched her], is that correct?

A. Yes.

Q. Not only did she say no, you testified she was screaming at the [other] two girls?

A. Yes.

Q. What was she screaming at the other two?

A. Uhm—that they were lying, that their dad wouldn't do nothing like that, they're just making up stories and that's why I kept questioning my kid, like, 'Please don't like [*sic*], be honest,' you know? [T.T.] was just going crazy. She was crying, she tried to kill herself, yeah.

Q. And when did she try to kill herself?

A. Because she loves her dad.

Q. My question is when?"

¶ 10  The State objected to the questioning on grounds of relevance, and the trial court sustained the objection. After additional cross-examination, defense counsel returned to the topic of a suicide attempt, this time expressly inquiring about M.T.:

"[MR. RIOS (DEFENSE COUNSEL)] Q. Again, you testified that M.T tried to kill herself, right?

[A.T.] A. Yes.

Q. And how did she do that?

A. Uhm—

MR. RODGERS [(ASSISTANT STATE'S ATTORNEY)]: Objection, relevance.

THE COURT: So—so I can only see—so tell me—I don't know—right now I don't have any foundation as to when this occurred, where it occurred, who was present—

MR. RIOS: Correct, Judge.

THE COURT: —because in order for me to tell if it's relevant, I have to know all of those things before I can tell if it's relevant. So if you want to try to lay a foundation for timing, asking questions, that's fine.

MR. RIOS: That's what I'm trying to do, Judge.

THE COURT: Okay, all right.

BY MR. RIOS:

Q. So when did [M.T.] try to kill herself?

MR. RODGERS: Judge, I apologize, I would ask for some—just a brief Offer of Proof before we go down the road, then.

THE COURT: So the point—it could be relevant if it happened before, so that's what I'm trying to find out—uhm—Mr. Rios, do you know the answers to these questions?

MR. RIOS: I don't know the answer to these. [A.T.] testified to them in Direct, so I'm trying to get to that.

THE COURT: So—

MR. RIOS: I don't know if it's relevant or not, it may very well be relevant.

THE COURT: So that's the problem is you can't ask question if we don't know—uhm—

MR. RIOS: It's just following up with her testimony on Direct.

THE COURT: So I don't—at this point in time, I don't know that it's relevant to what was said on June 12th, which is what she was questioned on Direct, and that she was also asked questions about going to the police after being told that, going to the hospital after being told that, going to Kane County after being told that. I don't know what the time of the last one, it appeared that the questions were the same dates for the other two places, so I don't know if she attempted to commit suicide months later, I don't know how that's relevant.

MR. RIOS: Judge, then, I have no further questions."

¶ 11    Salinas Ramirez testified at the section 115-10 hearing that, on July 11, 2019, she was employed as a forensic interviewer at the Child Advocacy Center and, on that date, conducted separate interviews of M.T. and D.T. Salinas Ramirez received specific training consisting of a

40-hour class focused on interviewing children to prepare her for her role at the Child Advocacy Center. The basic interview format for interviewing a child consisted of five distinct stages. The first stage was rapport building, consisting of getting to know the child and making him or her comfortable with the interviewer. Next was narrative practice, consisting of allowing the child to practice giving a narrative description of events, such as everything the child did on the day of the interview, from waking up to arriving at the interview. The third stage focused on the topic of concern, consisting of allowing the child to describe the incident that was the reason for the interview. Next, a break would be taken, allowing the interviewer to consult with the multi-disciplinary team for the team to provide input to the interviewer about any more questions that should be asked of the child. Finally, the closure stage, consisting of discussing another topic with the child before ending the interview. During the interview, Salinas Ramirez would typically ask open-ended questions to elicit the child's description of the events, and she would employ leading questions to elicit details about the events the child had described.

¶ 12    Salinas Ramirez testified about her July 11, 2019, interview of M.T. She authenticated the recording of the interview as well as a writing M.T. prepared during the interview. Salinas Ramirez also discussed the use of an anatomically correct doll and described how M.T. used it to describe defendant's actions. Specifically, after M.T. had identified that defendant had touched "her butt and her front private part," Salinas Ramirez asked her to complete the writings. M.T. wrote "F went in pee," and defendant "put his F in my bad," and stated that "F" meant finger. She also wrote that defendant "rubbed my butt." Salinas Ramirez, with input from the multi-disciplinary team, used the doll to elicit in detail what M.T. was describing. M.T. placed her finger inside of the vagina of the doll and rubbed the doll's buttocks to explain the actions that defendant performed on her.

¶ 13    Salinas Ramirez also testified about her July 11, 2019, interview of D.T.  She authenticated the recording of the interview and a drawing which was used to help D.T. explain defendant's actions.  She noted that she had written the words on the drawing that D.T. used to identify the relevant portions of the body, but D.T. had drawn the circles showing where defendant had touched her, namely, the buttocks, breasts, and vagina.  Salinas Ramirez also explained that a second portion of the recording dealt with D.T.'s statements about another person (unrelated to these proceedings) touching her, and this portion was excluded from the proceedings as not being relevant to D.T.'s statements about defendant.

¶ 14    On June 7, 2021, the trial court ruled that the recordings of the interviews, along with the writings and drawings produced at the interviews would be admissible at trial.  The court also ruled that M.T.'s June 12, 2019, oral statements to A.T., and M.T.'s written note to A.T. made a few days thereafter would be admissible at trial.  Regarding the June 12 statements, the court found that, although A.T. initiated the conversation with M.T., A.T. did not suggest that defendant or anyone else had inappropriately touched M.T.; on the contrary, the court believed that A.T.'s questioning attempted to get M.T. to deny that defendant had done anything inappropriate to her.  The court also ruled that the remaining statements, D.T.'s statements to A.T., and both children's statements to Collins and Nuthana, would be excluded because they lacked sufficient safeguards of reliability.

¶ 15    On February 22, 2022, the case advanced to trial.  Defendant and A.T. had been married and had three daughters, T.T., D.T. (born in 2009), and M.T. (born in 2010).  In 2011, A.T. was sentenced to a prison term, and while she was serving her term, she and defendant divorced.  Defendant had another child, Z.T., with another woman.  Defendant, and the four children, T.T., D.T., M.T., and Z.T. moved in with defendant's mother, Yolanda, who was renting a two-story,

three-bedroom apartment. Defendant and Yolanda each had a bedroom, and T.T., D.T., and M.T. shared a bedroom. Z.T. slept in Yolanda's bedroom.

¶ 16 While defendant resided with Yolanda, he was unemployed. Yolanda was employed and worked from 7 a.m. to 1 p.m. The three older children attended a local school from 8 a.m. to 2:30 p.m., and defendant would care for Z.T. at Yolanda's apartment. Yolanda primarily provided care for the children, but there were times that defendant was alone with the children. Yolanda also testified that defendant drank alcohol, preferring Hennessy cognac.

¶ 17 In 2018, A.T. was released from prison, and she moved into a house in Chicago with Collins, whom she met at a halfway house. According to A.T., no formal custody agreement was ever created. Instead, T.T., D.T., and M.T. visited occasionally but, during the school year, resided with defendant. Yolanda testified that, since 2016, defendant had custody of the children.

¶ 18 D.T. testified that, one day during the spring or summer while she was still living with defendant, she and defendant fell asleep in the living room downstairs. Each occupied a separate couch in the living room. T.T. and M.T. were asleep upstairs. Yolanda had been downstairs but left. After Yolanda left, defendant laid down next to D.T. D.T. believed that defendant was drunk. Defendant began touching in "the front and back" under her clothes. D.T. circled the buttocks and vagina on an anatomical drawing given her by the State and subsequently admitted into evidence.

¶ 19 D.T. testified that the touching happened on only one occasion, and defendant never touched her chest. Defendant would sometimes look at D.T. in a way that made her feel uncomfortable. The same day or day after, D.T. told M.T. about what happened. D.T. did not tell T.T. because she did not trust T.T. to keep it a secret, because D.T. felt that T.T. was always "snitch[ing]" on her. D.T. did not immediately tell A.T., but told her about the touching at the same time when M.T. told A.T. Thereafter, during 2019, A.T. would mention the incident frequently to D.T., "talking about it; telling [D.T.] about how this happened."

¶ 20    M.T. testified that defendant touched her after she fell asleep in the living room. The touching occurred in the morning while it was still dark outside. T.T. and D.T. were upstairs because they were in trouble. M.T. felt defendant's hand in the front and back beneath her underwear. M.T. circled the buttocks and vagina on an anatomical drawing given to her by the State and subsequently admitted into evidence. The touching stopped when she woke up, and then she went upstairs. M.T. told only D.T. about the touching. According to M.T., defendant touched her only one time.

¶ 21    M.T. testified that she, T.T., and D.T. were staying with A.T. and Collins in Chicago for the summer when A.T. noticed something about her "front part," as she was about to shower. A.T. asked her why her "front part was a little bit too open," and asked if defendant had caused it. M.T. did not answer initially, but after repeated questions by A.T., she said yes. M.T. acknowledged that, after this initial discussion, A.T. had spoken with M.T. about testifying in court, and she made M.T. feel comfortable about discussing the incident with others.

¶ 22    On June 12, 2019, D.T. and M.T. were examined by a pediatric nurse. The nurse observed no abnormalities and both children's examinations were normal. The nurse cautioned that a normal examination did not rule out the possibility of sexual assault because the body heals quickly and touching by itself typically will not result in a physical injury.

¶ 23    Salinas Ramirez testified that, on July 11, 2019, she conducted separate interviews of D.T. and M.T. Salinas Ramirez testified consistently with her testimony at the section 115-10 hearing and authenticated the recordings of the interviews with D.T. and M.T. The recordings were admitted into evidence and then published to the jury.

¶ 24    In D.T.'s interview with Salinas Ramirez, she stated that, when she was nine years old, defendant touched the "bad places, front and back" with his fingers. The contact occurred on a day that defendant's friend came over. D.T. was on one couch and M.T was sleeping on the other

couch. After defendant's friend left, he began drinking liquor and hugging D.T. D.T.'s grandmother (Yolanda) made a comment about defendant's actions, and defendant told her to "shut up" and leave. After Yolanda left, defendant, using his hand, rubbed D.T.'s buttocks over her underwear. Defendant then moved his hand under D.T.'s underwear and rubbed her vagina with his fingers. D.T. also stated that, on another day when she was still nine years old, he touched her chest with his hand. D.T. believed that defendant touched her only when he was drinking. When D.T. was given an anatomical drawing to show where she had been touched, she circled the buttocks, vagina, and chest.

¶ 25    In M.T.'s interview with Salinas Ramirez, she stated that, when she was seven years old, defendant touched her "in [her] bad part" with his "fingers." M.T. explained that A.T. saw her in the bathroom and noticed that the "circle" where she "pees" had gotten bigger. M.T. stated that it got bigger because of defendant. Salinas Ramirez asked M.T. what happened, and M.T. said defendant went "in" which caused M.T. pain.

¶ 26    As part of the interview, Salinas Ramirez provided M.T. with a pen and paper for her to describe the incident. M.T. wrote, with Salinas Ramirez's help with spelling a few words, that defendant's "F went in [her] P." Salinas Ramirez asked about that, and M.T. explained that defendant rubbed around and "in." According to M.T., the incident happened when she was downstairs in the living room of Yolanda's residence. M.T. also wrote that, on the same day as the vaginal touching, defendant rubbed her buttocks with his hand. M.T. moved and went upstairs, thus ending defendant's physical contact with her. M.T. told Salinas Ramirez that she told D.T. what happened, and D.T. told A.T. According to M.T., defendant touched her in those areas only once.

¶ 27    T.T., testifying for defendant, stated that defendant treated her and her sisters the same. When, during summer vacation, A.T. called the family together in the living or dining room for a

meeting, she was "very confused" whether M.T. was telling the truth about defendant's actions. T.T. never saw any indications that defendant touched M.T. or D.T. T.T. agreed that, sometimes, they would fall asleep on the couch, but when that happened, all three sisters would be sent upstairs to bed.

¶ 28 The State called A.T. to testify during its case-in-chief. After preliminary questions about D.T.'s and M.T.'s age and identification of defendant, when the questioning began to focus on the 2019 incident, A.T. stated that she was "not comfortable" testifying and asked to stop her testimony. The trial court admonished A.T. that she was ordered to testify truthfully, or she could be held in direct criminal contempt. A.T. sought clarification, asking if the court meant that "either I stay here and tell the truth or you're going to send me to jail," and then she inquired "what if I don't remember." The court informed her that a loss of memory was different than a refusal to testify and tried to encourage A.T. to truthfully testify by reminding her that both D.T. and M.T. had managed to testify before the jury despite being much younger than A.T.

¶ 29 A.T.'s examination by the State resumed, focusing on the events of June 12, 2019. A.T. testified that she saw M.T. sitting on the toilet and asked if she was okay. A.T. asked this question only once, and M.T. replied that she was fine. The State inquired if A.T. asked M.T. if anyone had touched her, and A.T. answered that she asked all her children that question. The State inquired about the note M.T. allegedly wrote a few days after the June 12, 2019, family meeting, and A.T. replied she could not recall.

¶ 30 The State changed tack and inquired about A.T.'s testimony from the April 15, 2021, section 115-10 hearing. A.T. remembered testifying at that hearing but professed that she could not recall her previous testimony. The State then read the questions and answers from the section 115-10 hearing, asking if A.T. remembered being asked the question and giving the reply; A.T. generally answered that she did not recall. Specifically, A.T. recalled that she questioned T.T.,

D.T., and M.T., but she could not remember her questions to them. The State asked if A.T. recalled being asked questions and giving answers about how M.T. described defendant's touching to her. A.T. replied that she was confused because "I don't recall her telling me where [defendant] put [his finger] at. I do recall saying I talked to her about it and where it was, that he was drunk or something."

¶ 31 The State proceeded to question A.T. about her section 115-10 hearing testimony concerning her questioning of M.T., her description of the circumstances, and M.T.'s responses to the questions. Specifically, the State inquired about the previous testimony concerning M.T.'s note, written a few days after the June 12, 2019, meeting. The State asked: "Do you recall the question: And that's when she told you that she wanted to write something down; your answer, yeah, because my kid tried to kill herself." A.T. recalled giving that answer.

¶ 32 Thereafter, the parties stipulated to the admission and reading of a redacted transcript of A.T.'s testimony from the section 115-10 hearing. The trial court instructed the jury that it could consider A.T.'s earlier inconsistent statements as substantive evidence when they were made under oath at another proceeding. The State read the portions of A.T.'s testimony during the section 115-10 hearing that it had inquired about during A.T.'s direct testimony. The stipulated portion of the transcript read to the jury once again included the following: "Question, and that's when she told you that she wanted to write down something? Answer, yeah, because my kid tried to kill herself." The redacted transcript was entered into evidence as State's exhibit No. 22.

¶ 33 In closing argument, the State contended that the victims were credible and consistent across their testimony and about their out-of-court statements. The defense contended that the victims were rehearsed, and A.T. influenced the children to fabricate their statements because she wanted custody of the children. On February 24, 2022, the jury found defendant guilty of counts I-VII, and it acquitted him of count VIII (touching of D.T.'s chest).

¶ 34    On March 24, 2022, defendant filed a posttrial motion seeking a new trial. Defendant argued that the evidence was insufficient to support beyond a reasonable doubt the findings of guilt and that the trial court erred in limiting him to six peremptory challenges. On April 19, 2022, defendant filed a motion to continue his sentencing based on a letter A.T. sent to the State claiming that the prosecution had forced her children to lie and that she was refusing to attend the sentencing hearing. Defendant stated that he needed time to investigate the claims in A.T.'s letter and whether either or all of the victims and A.T. were recanting their testimony or whether the State had failed to tender any materials to the defense relevant to the claims in A.T.'s letter. The trial court postponed sentencing until June 16, 2022.

¶ 35    On June 8, 2022, defendant filed another motion to continue sentencing. Defendant again referenced A.T.'s letter to the State. Defendant stated that he was attempting to investigate the claims in A.T.'s letter to the State, but the victims and A.T. were out of state and interviews could not be completed before the sentencing date. The trial court granted the continuance.

¶ 36    On October 19, 2022, the matter advanced to hearing on defendant's posttrial motion. Defendant argued only that the evidence was insufficient to prove his guilt beyond a reasonable doubt and that he was deprived of his full complement of peremptory challenges pursuant to statute. The trial court denied defendant's posttrial motion, and the matter turned to sentencing. Following an evidentiary hearing and argument, the court entered judgments of conviction against defendant on counts I (predatory criminal sexual assault of M.T.), III (predatory criminal sexual assault of D.T.), V (aggravated criminal sexual abuse of M.T.), and VI (aggravated criminal sexual abuse of D.T.). The remaining convictions were merged into the corresponding counts, and defendant was sentenced to two concurrent terms of imprisonment of natural life for the predatory criminal sexual assault convictions, and to two concurrent three-year terms of imprisonment for the aggravated criminal sexual abuse convictions.

¶ 37     On October 19, 2022, the State Appellate Defender was appointed to represent defendant on appeal.  However, no notice of appeal was filed after that appointment.  On September 28, 2023, defendant filed a motion seeking a supervisory order from our supreme court to allow him to file a notice of appeal.  On October 17, 2023, defendant's motion was granted, and, on October 19, 2023, defendant filed his notice of appeal.

¶ 38                                II. ANALYSIS

¶ 39     On appeal, defendant argues that A.T.'s testimony from the section 115-10 hearing, "my kid tried to kill herself," which was presented during the State's questioning of A.T. and contained in a stipulated transcript of A.T.'s section 115-10 hearing testimony, deprived him of a fair trial because evidence of M.T.'s suicide attempt was irrelevant and unduly prejudicial.  Defendant also argues that the trial court erred in admitting M.T.'s out-of-court statements to A.T. pursuant to section 115-10 because they lacked sufficient safeguards of reliability.

¶ 40                          A. "[M]y kid tried to kill herself"

¶ 41     Defendant first argues that A.T.'s testimony from the section 115-10 hearing, "my kid tried to kill herself" and repeated twice to the jury by the State—once during direct examination of A.T. and once in reading a stipulated transcript of A.T.'s section 115-10 hearing testimony containing the statement—was irrelevant and so unduly prejudicial as to deprive him of a fair trial.  We disagree.

¶ 42     Initially, we note that, during A.T.'s direct examination, defendant did not object to the inclusion of the statement.  We further note that defendant stipulated to the inclusion of the transcript of the section 115-10 hearing.  Finally, in his posttrial motion, defendant did not raise the issue of A.T.'s statement that her "kid tried to kill herself."  Therefore, as a technical matter, the issue is forfeited.  *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appeal

requires a defendant to lodge a contemporaneous objection during trial and to include the issue in a written posttrial motion).

¶ 43    Defendant argues that we may nevertheless address a forfeited issue under the doctrine of plain error.  The plain-error rule (Ill. S. Ct. R. 615 (eff. Jan. 1, 1967)) provides a narrow exception to forfeiture and allows a reviewing court to consider a forfeited error (1) where the evidence is closely balanced or (2) where the error affects the fairness of the defendant's trial and calls into question the integrity of the judicial process.  *People v. Jackson*, 2022 IL 127256, ¶¶ 18-19.  However, where a defendant has invited a particular error, a court will not review it under the plain-error doctrine because to do so encourages improper gamesmanship and duplicity, and it is manifestly unfair to permit a defendant to use the error he or she injected into the trial as a vehicle for appellate relief.  *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 76.  Here, defendant stipulated to the inclusion of the "my kid tried to kill herself" testimony in the portions of transcript of the section 115-10 hearing read to the jury and submitted into evidence as an exhibit.  A stipulation is an agreement between the parties or their counsel with respect to an issue before the court.  *People v. Woods*, 214 Ill. 2d 455, 468 (2005).  Thus, defendant, through defense counsel, affirmatively acted to enter into the stipulation about the challenged testimony and, in so doing, injected the error of which he now complains into the proceedings below.  Accordingly, we will not address the issue under the plain-error doctrine.  *Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 76 (where a defendant has invited the error, reviewing courts will not review any related plain-error claim).

¶ 44    To the extent that defendant argues that he simply did not participate in creating the error he attributes to the challenged testimony, we disagree.  While defendant's failure to object to the recitation of the challenged testimony during A.T.'s direct examination before the jury may not count as "acquiescence" for the purposes of the invited-error bar to plain-error consideration, the

explicit action of stipulating to the same testimony in the transcript published to the jury is a sufficient action to support applying the invited-error bar here. See *People v. Childress*, 2024 IL App (4th) 240669-U, ¶¶ 22-23 (a failure to object will not qualify as invited error because it is a passive acquiescence in the error; instead, some affirmative action must be undertaken, either by asking the court to commit the error or by expressly agreeing to the commission of the error). The agreement embodied in the stipulation is precisely the sort of express agreement to the commission of the error contemplated under invited-error principles. Thus, we reject defendant's claim that he did not acquiesce or otherwise participate in allowing the admission of the challenged testimony.

¶ 45 Defendant argues that invited error is not applicable because it was a passive failure to object to the "my kid tried to kill herself" testimony and not some express agreement to the challenged error, such as a stipulation. The record belies defendant's contention. Immediately before the State read the transcript, the trial court told the jury that the State would "present[,] through what is called a stipulation[,] some evidence. [The State is] going to read to you from a transcript." After the State read the transcript, the court asked defendant, "Based on the stipulation, any objection?" Defendant did not object. The record therefore affirmatively rebuts defendant's claim and demonstrates that defendant stipulated to the contents and admission of transcript containing the challenged testimony. Because defendant invited the error of which he now complains, any plain-error review of the challenged testimony is precluded.

¶ 46 Defendant cites several cases for the proposition that invited error is inapplicable because he passively accepted the admission of the "my kid tried to kill herself" testimony. Far from supporting his position, these cases strongly support our determination because, just as in those cases, defendant affirmatively acted to inject the error of which he now complains. See *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001) (the defendant submitted verdict forms used by the trial court; invited error applied); *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (the defendant

affirmatively, albeit grudgingly, agreed to the procedure to be used to obtain records; invited error applied); *People v. Bush*, 214 Ill. 2d 318, 337 (2005) (the defendant was precluded from challenging the foundation of testimony where he stipulated to the admissibility of the testimony; invited error applied); *People v. Peel*, 2018 IL App (4th) 160100, ¶¶ 30-32 (the defendant and the State jointly submitted an answer to a jury question; invited error applied). By stipulating to the admission of the transcript, defendant did not passively accept the admission of the testimony; rather he actively contributed to it, and this is sufficient to apply the invited error doctrine.

¶ 47    Next, defendant argues that we may reach the otherwise forfeited error because trial counsel provided ineffective assistance by not contesting the admission of A.T.'s "my kid tried to kill herself" testimony. An ineffective assistance claim is reviewed under the familiar *Strickland v. Washington*, 466 U.S. 688 (1984) rubric: the defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance resulted in prejudice. *People v. Johnson*, 2021 IL 126291, ¶ 52. To establish prejudice, the defendant must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* A reasonable probability means a probability sufficient to undermine confidence in the outcome. *Id.* ¶ 54. In a case where the defendant challenges his finding of guilt, this means that the question is whether there is a reasonable probability that, without counsel's errors, the trier of fact would have had a reasonable doubt as to the defendant's guilt. *Id.* To prevail on an ineffective assistance claim, the defendant must satisfy both prongs; the defendant's failure to demonstrate either deficient performance or prejudice will defeat the ineffective assistance claim. *Id.* ¶ 53. Thus, we need not consider both deficient performance and prejudice but may proceed directly to whichever is the dispositive ground. *Id.*

¶ 48    Here, defendant cannot demonstrate the requisite prejudice, that is, that without the admission of A.T.'s "my kid tried to kill herself" testimony, the jury would have had a reasonable doubt as to defendant's guilt.  Focusing on that testimony first, we note that it was stated twice during the trial: first during A.T.'s direct examination and second, when the portions of the transcript of A.T.'s section 115-10 hearing testimony were read to the jury.  During A.T.'s direct examination, the "my kid tried to kill herself" testimony was presented as impeachment of A.T.'s sudden loss of memory in the format of "do you remember being asked this question and giving this answer."  More testimony followed A.T.'s.  The next day, the transcript was read and admitted substantively, and the jury was instructed the transcript could be considered as substantive evidence.  The transcript was read immediately before the State rested, and then defendant presented T.T.'s and Yolanda's testimony in his case-in-chief.  The placement of the "my kid tried to kill herself" testimony during the trial did not unduly highlight it.  Moreover, neither the State nor defendant made any argument regarding it.  Because the suicide attempt was not emphasized, either in the testimony or in argument, no prejudice can accrue from it.

¶ 49    As a substantive matter, the "my kid tried to kill herself" statement is inherently ambiguous.  The jury did not hear a specific reference to which of her children A.T. was referring, but, assuming the statement refers to M.T. and not one of the other children, there are still at least three ways the statement could be interpreted: (1) that the child attempted suicide because she was distraught over the abuse, (2) that the child attempted suicide over remorse at having lied about her father, and (3) that the child attempted suicide for some reason entirely unrelated to the charges in this case or their truth or falsity.  Thus, the testimony that A.T.'s "kid tried to kill herself" is not inherently and unduly prejudicial to defendant's case; rather, there is a possibility it helps his case (the child lied about the abuse) as well as a possibility it is entirely unrelated to the case.  Defendant's claim that mentioning the suicide attempt alone was fatal to his case is not

substantively supported by the several possible meanings to A.T.'s testimony and plainly overstates any effect on the jury's determination.

¶ 50    If, as required under the prejudice rubric for an ineffective assistance claim, we remove the challenged testimony and consider the remaining evidence (see *People v. Johnson*, 2021 IL 126291, ¶ 54 (for a defendant challenging the finding of guilt, the question is whether there is a reasonable probability that, without counsel's errors, the trier of fact would have had a reasonable doubt as to the defendant's guilt)), there is no reasonable probability that A.T.'s twice-repeated statement that "my kid tried to kill herself" affected the jury's verdict. First, and most importantly, the State did not make any argument about the suicide attempt or its import. Neither party raised it in argument, and the statement, though repeated, was not made at a point in the proceedings that gave it any particular emphasis. The remaining evidence came from the victims, and this evidence was generally consistent between the victims as to the contours of the incidents. Defendant would have been drinking; the victim would be asleep on the couch in the downstairs living room, away from the other members of the family; defendant would lay down next to the victim while she was asleep; and defendant would touch the victim's genitals. Salinas Ramirez testified about how she conducted the interviews with the victims, emphasizing that the children would provide the general outline of the incident through open-ended questioning, and any omitted details could be fleshed out as the interview progressed through more directed questioning. The interviews conducted by Salinas Ramirez were then played for the jury. A.T.'s testimony at trial made it clear that she no longer wished to be part of the proceedings, and she conveniently could no longer remember her interactions with the victims concerning the defendant's actions. However, her testimony from the section 115-10 hearing was introduced to rebut her inability to recall and was admitted for the

jury to consider as substantive evidence.[2] Defendant's witnesses testified that they did not observe defendant inappropriately touching the victims, but this tends to corroborate the victims' accounts of the abuse occurring surreptitiously, when they were away from the rest of the family in Yolanda's apartment. In all, the jury was squarely presented with the evidence, including its flaws and inconsistencies, and, without the challenged statement about M.T.'s suicide attempt, the jury could not find a reasonable doubt based on the remaining evidence.

¶ 51    Defendant argues that "the prejudice prong of *Strickland* is satisfied by the same balance of factors that made the evidence 'closely balanced' for purposes of plain error," citing *People v. Holt*, 2019 IL App (3d) 160504-B, ¶ 47. While defendant does not much flesh out his *Strickland*-prejudice argument, we understand him to argue that the determination of whether the evidence is closely balanced should be employed in this case to determine whether prejudice has accrued from counsel's error in allowing the admission of A.T.'s "my kid tried to kill herself testimony." This is incorrect in several respects.

¶ 52    First, in assessing prejudice in an ineffective assistance scenario, the defendant is required to affirmatively prove that counsel's errors caused prejudice. *Johnson*, 2021 IL 126291, ¶ 55. This means that the defendant must show actual prejudice and not simply that the errors had some conceivable effect on the outcome of the proceeding. *Id.* Here, "my kid tried to kill herself" is inherently ambiguous, and the suicide attempt could have been prompted by defendant's actions, by remorse of M.T.'s participation in making a false claim against defendant, or by something entirely unrelated to this case. Thus, while it is conceivable that A.T.'s statement could have led the jury to improperly bolster the credibility of M.T.'s account, such a conclusion is inherently

---

[2]Defendant does not challenge on appeal the propriety of the admission of A.T.'s section 115-10 hearing testimony as a whole—only the "my kid tried to kill herself" statement specifically.

speculative and cannot satisfy the *Strickland* standard for prejudice. See *id.* ¶ 58 (in the absence of completed testing, the belief that the results would necessarily come out in the defendant's favor is speculative and cannot satisfy the prejudice prong of *Strickland*).

¶ 53    Second, the similarity in the analyses for plain error (closely balanced evidence) and ineffective assistance is the requirement of demonstrating prejudice contrary to defendant's assertion. In either analysis, the defendant must demonstrate the existence of prejudice, and both analyses are driven by the evidence and result oriented. *People v. White*, 2011 IL 109689, ¶¶ 133-34. Thus, the need for demonstrating prejudice is paramount, and this is the extent of the similarity between the analyses.

¶ 54    Third, defendant's reliance on *Holt* is misplaced. *Holt* stands for the proposition that the failure to find prejudice in a plain error analysis necessarily means that the defendant cannot demonstrate prejudice sufficient to support a claim of ineffective assistance. *Holt*, 2019 IL App (3d) 106504-B, ¶ 47 ("Because we have determined that Holt failed to meet his burden under the first prong of the plain-error inquiry—and thus that the evidence was not closely balanced—we hold that Holt cannot satisfy the prejudice prong of the *Strickland* inquiry."). *Holt* focuses on whether prejudice has or can be shown, and, thus, it fails to support defendant's argument.

¶ 55    Finally, we note that the key consideration in a plain error analysis is whether the error undermines our confidence in the result. *People v. Johnson*, 218 Ill. 2d 125, 141 (2005). Notwithstanding any similarity or even identity between the methodology employed in a plain error (closely balanced evidence) or ineffective assistance claim, as stated above, there is no reasonable probability that the "my kid tried to kill herself" testimony affected the outcome of the

trial. It was brief, it was isolated, it was not argued to the jury,[3] and it was inherently ambiguous in meaning. We therefore reject defendant's contention. Accordingly, we hold that, because defendant stipulated to the admission of A.T.'s testimony, "my kid tried to kill herself," he is barred from claiming plain error. Likewise, because no prejudice accrued from the admission of A.T.'s statement, "my kid tried to kill herself," defendant cannot maintain his claim of ineffective assistance of counsel.

¶ 56                    B. M.T.'s Out-of-Court Statements to A.T.

¶ 57    Defendant argues that the trial court erred in allowing M.T.'s out-of-court statements to A.T. about defendant's conduct under section 115-10 because the statements lacked sufficient safeguards of reliability. Defendant acknowledges that he did not object at trial to their admission and did not include the issue in a written posttrial motion, thereby forfeiting it for review. However, defendant argues that we may nevertheless reach the issue under either the plain error doctrine or a theory of ineffective assistance of counsel. Because defendant cannot demonstrate

---

[3]As to the impact of repetition, up to this point in our analysis, we have deliberately used A.T.'s statement, "my kid tried to kill herself," 18 times in the course of our analysis. This sort of repetition may tend to lend credibility where it may not be warranted (*e.g.*, *People v. Dupree*, 2014 IL App (1st) 111872, ¶ 52 (repetition of testimony lends it credibility it might not otherwise deserve because people generally tend to believe that which is repeated most often)), and the reader may now numbly be accepting that A.T.'s testimony factually refers to M.T., when our analysis of A.T.'s section 115-10 hearing testimony demonstrates that, factually, she seemed to be referring to T.T. when she delivered that testimony. Compare our repetition to the trial, in which the statement was presented twice, on different days, briefly, and then never mentioned again either in testimony or argument. There is no undue prejudice, meaning a reasonable probability that the outcome would have been different absent the statement, accruing from the admission of this testimony.

prejudice accruing from the admission of M.T.'s out-of-court statements to A.T., his claims under plain error or ineffective assistance cannot succeed, and we confine our analysis to the narrow issue of prejudice.

¶ 58    As a starting point, the focus of plain error analysis is whether there is sufficient prejudice, meaning that any error undermines our confidence in the result. *Johnson*, 218 Ill. 2d at 141. Likewise, in analyzing a claim of ineffective assistance of counsel, in the absence of prejudice (again, roughly stated as a loss of confidence in the result), the claim must fail. *Johnson*, 2021 IL 126291, ¶ 52. Therefore, if the result will be unaffected regardless of the claimed error, then the defendant cannot demonstrate prejudice, and his claims under either plain error (closely balanced) or ineffective assistance must fail.

¶ 59    Next, defendant challenges only the statements of M.T. to A.T.; he does not challenge the statements that M.T. and D.T. made to Salinas Ramirez, the recordings of their interviews, or Salinas Ramirez's testimony about M.T. and D.T.'s statements. By failing to challenge the admission of this evidence on appeal, defendant has effectively conceded that it was properly admitted. The question thus becomes whether M.T.'s statements to A.T. are only cumulative of the evidence properly admitted. We hold that they are.

¶ 60    A.T. testified that, after observing M.T.'s vagina as M.T. was awaiting her turn for a shower, she asked M.T. whether anyone had inappropriately touched her. When M.T. reluctantly stated that defendant had done so, A.T. repeatedly asked M.T. if she were being truthful. A few days later, M.T. was interviewed by Salinas Ramirez, and she described, in much greater detail, the circumstances of the touching. Likewise, D.T. was also interviewed by Salinas Ramirez, and her testimony about the manner of circumstances was substantially similar to M.T.'s description. M.T.'s statements to A.T. may have started the investigative ball rolling, but A.T.'s trial testimony was not remotely detailed about the methods and circumstances of defendant's touching of M.T.,

and it was only cumulative of M.T.'s statements to Salinas Ramirez and Salinas Ramirez's testimony.[4] As such, in the absence of A.T.'s testimony, there is no reasonable possibility that the outcome would have been different, and our confidence in the result is not undermined. In short, A.T.'s testimony was cumulative to that of M.T. and could not have affected the outcome of the case.

¶ 61    Defendant argues that A.T.'s testimony improperly bolstered M.T.'s description of the events, relying on *People v. Mitchell*, 155 Ill. 2d 344, 351 (1993) (statements from "youthful victims become more credible, more reliable, and better understandable when supported by the testimony of adults corroborating them"). *Mitchell*, however, is plainly distinguishable. First, the victim in *Mitchell* gave both conflicting testimony at trial and conflicting accounts to the interviewer and other adults, so the concern about improperly enhancing the inculpating version as opposed to one of the conflicting versions is paramount in that case. *Id.* Moreover, the adults' explanations of what the child's jumbled and self-contradictory statements meant held considerable risk of reinforcing the adults' explanations and impeding the factfinder from accurately determining historical fact. *Id.* Here, by contrast, M.T. consistently identified defendant as the perpetrator in all her accounts to adults, and her trial testimony and out-of-court statements to A.T. and Salinas Ramirez were also all substantially consistent. Further, M.T.'s testimony about the general manner about how the touching occurred were consistent with D.T.'s account: defendant, who had been drinking, took an opportunity when each child was asleep on a

---

[4]While we note that this imports a measure of repetition as discussed above, the lack of detail apart from the identification of defendant as the perpetrator deprives that repetition of much, if not all, of its pernicious force.

downstairs couch to abuse her, and, in each case, he lay down next to the sleeping child and awakened her when he began touching her.

¶ 62   Additionally, in *Mitchell*, the trial court did not hold a section 115-10 hearing at all, so there was no previous determination of the reliability of the victim's out-of-court statements, and our supreme court noted that the defense counsel there was understandably hesitant to try to establish the reliability or its lack of the child's out-of-court statements for the first time during the trial. *Id.* at 352-53.  Here, the trial court held a section 115-10 hearing, which permitted defense counsel to focus their efforts appropriately rather than grappling with the unadjudicated reliability of the out-of-court statements from the child-victims.

¶ 63   The issues in *Mitchell* are not present here, and A.T.'s testimony about M.T.'s statements to her could not reasonably have affected the outcome.  Accordingly, we reject defendant's contention and hold that, even if A.T.'s testimony constituted error, no prejudice could have accrued from it.

¶ 64                                    III. CONCLUSION

¶ 65   For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 66   Affirmed.